Per Curiam :
This case was referred to Trial Commissioner George Willi with directions to make findings of fact and recommendation for conclusions of law. The commissioner *312 has done so in an opinion and report filed on November 3, 1965. Plaintiff filed exceptions to the commissioner’s report and a brief and defendant filed a statement pursuant to Rule 62(b), that although defendant disagrees with the trial commissioner’s opinion in regard to the jurisdictional question, defendant elects to submit the case on the commissioner’s report without exceptions and brief. The case was orally argued by plaintiff’s counsel. Since the court agrees with the trial commissioner’s findings, opinion and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Plaintiff is therefore not entitled to recover and her petition is dismissed.
OPINION OF COMMISSIONER*
Willi, Commissioner:
Plaintiff is the former wife of Harry Burtt who, until April 1955, was an overseas civilian employee of the United States Army.
She sues in this court for damages[1] resulting from breach of an alleged oral contract, made with her by a member of the Army Medical Corps, to provide her with marriage counseling assistance at an Army hospital in Germany. Instead of receiving such assistance at the hospital, the plaintiff says, she was involuntarily separated from her .three children and confined for treatment as a mental patient for approximately seventy-one days and then evacuated alone to the United States for further hospitalization which only was terminated by the issuance of a court order directing her release from custody.
The original petition, filed December 27, 1957, was generally lacking in factual particulars as to the creation of the alleged contractual agreement concerning marriage counseling assistance.
On January 17,1958, before answer, the defendant moved for dismissal on jurisdictional grounds, asserting that though labeled as a contract action, the plaintiff’s essential grievance sounded in tort. The plaintiff duly responded, acknowl *313 edging the tortious aspects of her claim but insisting that the wrong complained of really derived from breach of a contractual undertaking on which she elected to stand. See Keifer & Keifer v. Reconstruction Finance Corporation, 306 U.S. 381, 395 (1939).
In the course of oral argument before the court on March 31, 1958, plaintiff was granted leave to amend her petition. This she did on April 18,1958.
In the amended petition, plaintiff spelled out her breach of contract theory in terms of a specific verbal agreement between herself and Dr. Alva Miller, an Army psychiatrist, under which both she and her husband, were to receive marriage counseling assistance, and that alone, at the Army’s 98th General Hospital in Munich.
On April 29,1958, in the face of plaintiff’s amended petition, the defendant filed a motion for leave to withdraw its motion to dismiss for lack of jurisdiction. The court allowed the motion the following day, and in due course the defendant filed an answer generally denying the factual allegations of the amended petition. The case then proceeded to a series of trial sessions in various locations, both in this country and abroad.
Consonant with the pleadings, the central issue at trial concerned the circumstances under which the plaintiff was first hospitalized in Munich and later evacuated alone to the United States.
Notwithstanding its earlier voluntary withdrawal of its jurisdictional objection to the suit, the defendant devotes the major portion of its brief to the same proposition that it had urged on motion, i.e., that the claim stated sounds in tort and therefore is without this court’s jurisdiction.
Conspicuously absent from defendant’s elaborate jurisdictional presentation is the contention, or even the suggestion, that Dr. Miller lacked authority to act for the Government in consummating the agreement with the plaintiff that her petition alleges was made. Cf. Federal Crop Insurance Corp. v. Merrill, 332 U.S. 380 (1947).
This is the controlling feature that distinguishes the instant case from the well-settled line of authority to the effect that a party cannot bring a tortious claim within this court’s *314 jurisdiction by framing it in implied contract. McArthur v. United States, 29 Ct. Cl. 191 (1894) ; Hill v. United States, 149 U.S. 593, 598 (1893).
The distinction is clearly defined in Bigby v. United States, 188 U.S. 400 (1903), where the petitioner, who had been summoned to the United States Marshal’s office in a federal building, sought damages under the Circuit Court’s Tucker Act[2] jurisdiction for injuries sustained in the federal building’s elevator as a result of the Government’s alleged breach of an implied contract to maintain its premises in a safe condition. In holding that the claim sounded in tort and was, therefore, without the Circuit Court’s Tucker Act jurisdiction, the Court repeatedly emphasized the absence of a contractual agreement between the petitioner and any Government agent vested with authority to make such an agreement. The Court was equally clear, however, in declaring that where an enforceable contract was alleged, an action for breach was not without the bounds of the Tucker Act simply because elements of tort were present in the claim.
Thus, this court has declared that a tortious breach of contract is not a tort independent of the contract so as to preclude an action under the Tucker Act. Chain Belt v. United States, 127 Ct. Cl. 38, 54, 115 F. Supp. 701, 712 (1953). Indeed, the United States has itself successfully urged that even though many breaches of contract may be treated as torts, if the wrong complained of is, as in the instant case, based entirely on the Government’s breach of promise, the claim is in substance one for breach of contract and may not be made the subject of suit under the Federal Tort Claims Act.[3] United States v. Smith, 324 F. 2d 622 (5th Cir. 1963). Accordingly, defendant’s showing that the within case could not be brought in a district court under its Federal Tort Claims jurisdiction is really irrelevant to the jurisdictional inquiry in the Tucker Act context.
Equally beside the point is the defendant’s reliance on Kozan v. Comstock, 270 F. 2d 839 (5th Cir. 1959) for the proposition that a suit for malpractice is an action in tort unless the defendant-physician has made an express agree *315 ment to effect a cure or has warranted that a particular result will be obtained. The plaintiff does not ground liability on the claim that bad or unskilled practice on the part of a Government physician resulted in injury to her.[4] Rather, she alleges simply that she made an express agreement with a senior Government doctor to leave her family for a limited period and enter a military hospital with her husband in order that both of them might receive marriage counseling assistance. Once in the hospital, she says, she was confined as a mental patient (in derogation of the express contractual agreement) and involuntarily separated from her three children until a court finally ordered her release. Her assigned grievance is not substandard treatment but treatment and confinement of a nature entirely different from that for which she contracted with an authorized Government representative. Thus, the claim’s genesis in contract is unmistakable. Whether or not the agreement that plaintiff alleges was actually made is a question for determination on the merits. If the evidence adduced refutes the existence of such an agreement, the defendant prevails because of considerations of proof, not because under the claim, as proved, the court is without jurisdiction. Evaluation of the proof presupposes jurisdiction. Ralston Steel Corp. v. United States, 169 Ct. Cl. 119, 340 F. 2d 663, cert. denied 381 U.S. 950 (1965).
As to the merits, the relevant facts, only summarized herein, are detailed in the accompanying findings of fact.
In 1943, after divorcing her first husband, plaintiff married Harry Burtt, a man approximately ten years her senior. Although the Burtts had three children, they found themselves less compatible as time went on.
In 1949, plaintiff instituted a separate maintenance suit which was discontinued by agreement of the parties in August of that year after Harry Burtt obtained employment with the Army as the civilian Post Safety Director for the Augsburg Army Post at Augsburg, Germany. Plaintiff and *316 the children accompanied him on this assignment, and the family lived in quarters off the post in the Augsburg suburb of Stadtbergen.
After an initial period of relative domestic calm, the Burtts again began having serious incompatibility problems in the late fall of 1951. These problems, involving differences over religion, disputes over proper methods of upbringing for the children, Harry Burtt’s interest in gambling and his maintenance of irregular hours, were accentuated by alcohol. While the record indicates that on occasion plaintiff may have drunk more than she should have, it is clear that Harry Burtt was an excessively heavy drinker by any standard. Under these emotional stresses plaintiff experienced a severe loss of weight and commenced to entertain serious misgivings as to her husband’s fidelity.
The Burtts’ marital relationship deteriorated progressively through the winter months with both parties increasing their consumption of alcohol. They quarreled frequently and, at times, violently. On one such occasion in February 1952, Harry Burtt struck the plaintiff and perforated an ear drum.
Being wholly unable to either cope with or improve her husband’s attitudes and conduct toward herself and the children, the plaintiff found her marital problems to be more than she could rationally bear. Although she maintained an outward appearance of calm and stability in her everyday contacts with members of the civilian community, her suspicions concerning her husband heightened to delusions and she took to telephoning various members of the command echelon of the Augsburg Post, including the commanding officer, to complain generally of her husband’s treatment of her. Her frustration with her domestic situation became complete when she was advised by a civilian attorney in the Office of the High Commissioner for Germany that, as the spouse of an overseas civilian employee of the Army, she could not effectively utilize the divorce procedures that would be available to her in the United States.
Shortly after being advised of the difficulty of obtaining a divorce or legal separation from her husband while in Germany, plaintiff took one of her daughters to the out-patient clinic of the Augsburg Post Dispensary for medical treat *317 ment of the flu. The attending pediatrician observed that the child appeared to be unduly shy and tense and suggested that the plaintiff have her examined by Lt. Dornbaeh, the only trained psychiatrist on the medical staff of the Augsburg Post Hospital, an installation with limited medical facilities. The plaintiff told the pediatrician that whatever emotional problems the child was having were attributable to discordant relations between her parents. The pediatrician then suggested that the plaintiff herself see Dr. Dom-bach. Since neither party called the pediatrician as a witness, his reasons for referring plaintiff to a psychiatrist cannot be ascertained from the record.
In any event, the plaintiff accepted the pediatrician’s recommendation and visited Dr. Dornbaeh on or about February 22, 1952. She presented a thin and nervous appearance and her conversation, centering on various suspicions and apprehensions concerning her husband, including the claim that he was surreptitiously drugging her, tended to be rambling and was at times incoherent. From his observations of the plaintiff at this interview, Dr. Dornbaeh concluded that she was suffering from a paranoid condition. He advised her that in all probability treatment would entail hospitalization but added that he desired a further interview with her and an opportunity to consult with another doctor before definitely prescribing a course of treatment.
The question of plaintiff’s mental state came to a head on February 28,1952, when, at 2:00 A.M., she telephoned the Post dispensary to inquire whether it was equipped to analyze a drink served her by her husband that she suspected contained a drug or poison.
Later that morning, Dr. Alva Miller, a colonel who was Consultant in Psychiatry to the Surgeon General for the European Theater, arrived at the Augsburg Post on a routine inspection of hospital facilities. At the request of both the commanding officer and Dr. Dornbaeh, he participated with the latter in a further examination and interview of the plaintiff. She acknowledged having lost some 25 pounds in recent months, and she showed the effects of an insufficiency of vitamins, frequently an indication of excessive use of alcohol. In extended conversation, she reiterated her *318 earlier remarks made to Dr. Dornbacb and added many others of a paranoid nature. At the conclusion of the interview, Dr. Miller advised plaintiff that she was suffering from severe malnutrition and emotional disturbance and recommended that she enter either the 5th General Hospital at Stuttgart or the 98th General Hospital at Munich for physical rehabilitation and appropriate psychiatric treatment.
Plaintiff’s earnest insistence that Dr. Miller suggested that she enter one of these hospitals for marital counseling, as distinguished from psychiatric treatment, simply does not comport with the realities of the situation as it then existed. A natural process of mental repression has largely removed the details of those most unpleasant realities from her mind.
She was unquestionably a woman whose suffering at the hands of her husband had become so intense as to severely affect her in both body and mind, and this was the state in which Drs. Dornbach and Miller found her.
In short, the contract for particular services on which plaintiff predicates her suit is wholly without factual basis.
Plaintiff willingly accepted Dr. Miller’s recommendation as to hospitalization, and at a further consultation in which Harry Burtt participated later the same day, it was mutually agreed that plaintiff would be promptly admitted at the 98th General Hospital for psychiatric treatment. It was also made clear to Harry Burtt that his wife’s condition might well necessitate evacuation to the United States for extended medical treatment. Though plaintiff strongly felt that her husband should undergo psychiatric treatment with her, defendant’s medical personnel made no commitment, express or implied, that this would be done. They did say that the doctors treating her would no doubt want to talk to her husband periodically.
Plaintiff proceeded to Munich, accompanied by her husband, where she was admitted at the 98th General Hospital on his application as her sponsor or principal within the contemplation of applicable Army regulations pertaining to medical care for civilian employees and their dependents.
The doctor assigned primary responsibility for her case was Captain Houlihan, a skilled and well-trained psychiatrist. Within a matter of days after plaintiff’s admission, he *319 reached two conclusions; first, that alcohol was not the cause of her trouble and, second, that there was a definite possibility that she would not regain mental or emotional normalcy until she was returned to the environment of her own family in California and removed from the influence of her husband. This possibility was something that Dr. Houlihan frequently discussed with plaintiff. In such discussions, however, both parties assumed that if returned to the United States plaintiff would be accompanied by her husband and children.
While a patient at the 98th General Hospital, plaintiff received the treatment and care appropriate to her needs. To build her strength she was put on a program of high-level vitamins and appetite stimuli. At the same time she received occupational therapy and psychotherapy treatments administered by Dr. Houlihan. Later, when it was concluded that her mental condition was essentially unimproved, Dr. Houli-han secured Harry Burtt’s written consent to initiate a series of electro- and insulin-shock treatments, recognized procedures for use in cases such as plaintiff’s. Plaintiff was given these treatments but, as indicated by her conversation, actions, and writings, her mental condition did not materially improve. In fact, her cooperativeness as a patient worsened to the extent that Dr. Houlihan felt constrained to have her placed in a so-called “closed” ward.
During plaintiff’s confinement, Harry Burtt periodically came to the hospital. On many of such occasions he was interviewed by Dr. Houlihan and once, in depth, by another member of the psychiatric staff. Uniformly, they found him to be altogether unsympathetic towards his wife’s problems and generally lacking in any genuine feeling of warmth or affection for her. Moreover, he evinced a definite determination to retain custody of the children by any means that was available to him.
Because occupied Germany was regarded as a potential combat zone, the Army operated the field hospitals located therein, such as the 98th General, under a policy designed to maintain availability of accommodations that would be required in emergency circumstances. The policy provided for evacuation to the United States of any patient, military or civilian, whose medical prognosis indicated that more *320 than 90-days’ hospitalization would be required to effect recovery.
It was in connection with the above policy that on April 11, 1952, plaintiff appeared before a three-member medical board comprised of Dr. Houlihan and two other members of the 98th General’s psychiatric staff. The board’s function was to evaluate plaintiff’s progress and present condition and, in that light, recommend an appropriate course of further care and treatment for her. The board found plaintiff to be in an unimproved paranoid state and recommended that she be evacuated to the United States for further hospitalization and psychiatric treatment. This recommendation was reviewed and affirmed by the commanding officer of the hospital.
When Harry Burtt learned of the medical determination to return the plaintiff to the United States, he promptly wrote a letter to the commanding officer of the Augsburg Post in which he outlined his proposed plan for his wife’s evacuation. Pie stated that he had contacted his brother in the San Francisco area and was sending him a power of attorney under which he was to effect plaintiff’s placement in a state mental institution. Further, he requested that, in deference to the interests of the children, he be permitted to delay his departure for the United States until June 30, after the close of their current school term.
Plaintiff does not dispute that when she was advised of her husband’s plan to defer his and the children’s return to the United States, she willingly acquiesced in it. Recognizing that her acquiescence was predicated on the assumption that her family, and especially her children, would come along approximately two months after her own return, it is nonetheless clear that under the circumstances the defendant’s agents cannot be faulted for returning her alone to the United States. Equally lacking in legitimate basis for complaint is the consideration of the manner in which the plaintiff’s return was effected, i.e., as an ambulance and litter patient transported in accordance with established procedures generally applied in the cases of returnees who suffered from mental disorders of plaintiff’s type — cases in which experience had demonstrated that the patients were prone to in *321 ordinate stresses and excitement stemming from the very fact of movement, especially movement by air.
When plaintiff arrived at the Army’s Letterman General Hospital on May 22, 1952, George Burtt, Harry Burtt’s brother, had already contacted the authorities there and advised them of his intention of filing a petition, pursuant to a power of attorney running from Harry Burtt, for plaintiff’s commitment. Because of this development, plaintiff was not admitted at Letterman but was instead taken to the San Francisco City and County Hospital where she was admitted on the evening of May 22,1952. George Burtt promptly filed the petition for commitment and on May 26, 1952, the Superior Court formally ordered the San Francisco City and County Hospital to conduct an examination of the plaintiff ancillary to a hearing on the question of her mental illness. Such an examination was conducted and on May 28,1952, the Clinical Director of Psychiatry at the San Francisco City and County Hospital submitted the following report and recommendation to the Superior Court:
The patient was transferred from Detention to Psychiatric on May 27 for further evaluation. See detailed report from an overseas hospital. Apparently, she has had an overt psychotic break for which she received appropriate treatment and now although her basic personality remains unchanged, her psychosis is in sufficient remission so that no overt delusions were elicited. Apparently, some of the participating factors were situation difficulties from which she is now separated, therefore, it is recommended that a trial outside adjustment be made under the care of her own family and that she be followed by out-patient psychiatric treatment.
On May 29, 1952, after a hearing in open court at which plaintiff was present, the Superior Court issued an order declaring plaintiff not mentally ill and discharging her from custody.
Following her release, plaintiff took up residence with her mother and secured employment, in which she performed most satisfactorily as a typist and file clerk, and later as a stenographer, with the Food Machinery and Chemical Corp. In this more wholesome and congenial environment she was, and always since has been, well-liked by her employers, co *322 workers, and social acquaintances. Uniformly, they have regarded her as a perfectly normal and well-adjusted person.
Also upon release, she immediately instituted a suit for divorce and began efforts to secure the return from Germany and legal custody of her children.
It is at this juncture that the final troublesome aspect of this case is reached. It centers on the fact that from the inception of her hospitalization at Munich until the end of 1954, when she went to Germany at her own expense, she was separated from her children.
While the hardship on plaintiff attendant to such a protracted separation from her children and their companionship is unmistakable, the Army’s responsibility for creating it, even in the abstract sense, is far less clear. A thoroughly informed assignment of responsibility is made impossible by deficiencies in proof.
Consideration of the record as a whole, however, impels the conclusion that the real protagonist in this entire unfortunate episode was Harry Burtt. The parties’ unexplained failure to call him as a witness necessitates resort to circumstantial evidence and logical inference as the only means of bridging some of the resulting evidentiary gaps. One of such gaps concerns Harry Burtt’s failure to return to the United States with the children at the close of their 1952 school year, in accordance with the proposal that he had presented to both the plaintiff and his commanding officer. Instead of doing this, it appears that he succeeded in obtaining a new two-year tour of duty at another location in Germany. While it may be said that morally the Army authorities should not have permitted Harry Burtt to extend his overseas duty tour because of his domestic circumstances, it cannot be said that their failure to refuse such permission constituted an actionable wrong for which plaintiff may have redress in this suit.
Plaintiff was hospitalized in Munich for treatment as a mentally sick person and not, as the petition alleges, for the limited and agreed purpose of receiving marriage counseling with her husband. The weight of the evidence shows that the treatment that she received was neither substandard nor inappropriate to her actual needs. When it became *323 apparent to the Army medical authorities, whose competence has not been challenged, that her cure could not be effected within the time that established and generally applicable military policies permitted her to remain in a European Theater field hospital, she was evacuated to the United States for further treatment at Letterman General Hospital. She agreed to be returned to the United States alone pursuant to an understanding with her husband that he would return with the children after they completed their current school term. When she arrived at Letterman Hospital, she was legally removed from the Army’s custody and jurisdiction by Harry Burtt, who had commissioned his brother to act for him under a power of attorney and set of instructions that he supplied. After her court-ordered release, she found that her husband was not living up to his agreement with her concerning his and the children’s return. What the plaintiff asks is that, in effect, the United States be held liable for her husband’s breach. Jurisdictional problems aside, there is simply no basis in the record for concluding that in any meaningful, much less improper way, the Army participated with Harry Burtt in his efforts to keep his children away from their mother.
In sum, however unfortunate and regrettable this entire experience undoubtedly is from the plaintiff’s standpoint, it is clear from the record as a whole that her former husband, and not the United States or its agents, was the real source of the alleged wrongs for which she seeks damages in this court.
FINDINGS of Fact
1. The plaintiff is a United States citizen now residing in San Jose, California, with the three children of her former marriage to Harry Burtt.
2. After divorcing her first husband, by whom she had no children, the plaintiff married Harry Burtt in 1943. He was her senior by approximately ten years. They had two girls and a boy who were 6, 8, and 10 years old, respectively, in 1952, the year in which plaintiff alleges that the Army breached a verbal contract to provide her with marriage counseling assistance by subjecting her instead to psychiatric treatment in an overseas military hospital.
*324 3. Tlie Burtts’ marriage was fraught with tensions almost throughout. It terminated by a divorce decree that became final in 1956 and under which she was awarded custody of the three children.
4. In 1949, the plaintiff filed a California suit against Harry Burtt for separate maintenance but the action was discontinued by consent of the parties when, in August of that year, Mr. Burtt gained civilian employment with the Department of the Army and the plaintiff determined to accompany him on his assignment as Post Safety Director for the Augsburg Army Post, Augsburg, Germany.
5. Instead of being quartered on the Army Post, the Burtt family lived in the civilian community of Stadtbergen, a suburb of Augsburg.
6. The plaintiff’s reputation in the civilian community, among those residents with whom she had usual social contact, was that of a normal, stable, sober, and intelligent person who was a conscientious mother and homemaker. She participated in such civic activities as the Parent Teachers Association and was den mother for a cub scout pack in the area.
7. Though the plaintiff presented a normal and composed appearance to outsiders, she and her husband began to have serious marital difficulties in the fall of 1951. He was a heavy drinker, consuming well over a fifth of whiskey a week in his home in addition to four or five double-shot highballs several evenings a week at the Post officers’ club. The plaintiff drank but not in such quantities. The drinking led to quarreling which frequently centered on the children’s religious upbringing, plaintiff being a Protestant and her husband a Catholic. The plaintiff also had apprehensions concerning her husband’s fidelity. As a result of this strained domestic situation, the plaintiff experienced a significant weight loss.
8. Finally, one evening on or about February 20,1952, the plaintiff and her husband quarreled in their home and the dispute culminated in his striking her about the face, perforating an ear drum.
9. The following morning the plaintiff sought out an American attorney, Eichard Sheldon, who was employed by the Allied High Commissioner for Germany as the United *325 States Attorney for tíre District of Augsburg. The plaintiff had previously met Sheldon socially at the Post officers’ club and her purpose in seeing him on the morning in question was twofold — to obtain counsel as to the legal avenues open to her in Germany for securing a divorce, and to ascertain the means by which she could effectively preserve evidence of infidelity by her husband for use in a divorce action to be later brought in the United States.
10. The plaintiff found Sheldon indisposed at home and spent almost three hours with him recounting a long history of marital difficulties with her husband. In doing this, she gave the impression of composure under considerable self-restraint.
11. Sheldon informed the plaintiff that he was personally engaged only in criminal matters and that it was his understanding that, in keeping with United States policy of preventing the airing in an occupied country of the domestic problems of American personnel and their wives, the judicial system established under the High Commissioner’s Office lacked domestic relations jurisdiction. He recommended that she consult with one of the American attorneys engaged in private practice in Munich, but she demurred because of lack of funds.
12. A day or two after her consultation with Mr. Sheldon, the plaintiff took her younger daughter, Linda, to the Augsburg Post Dispensary for treatment of flu by an Army pediatrician. The pediatrician observed to the plaintiff that her child seemed unduly upset and quite shy and recommended that she be examined by Dr. Dornbach, a lieutenant who was the Post psychiatrist. Thereupon the plaintiff explained that whatever emotional problems the child was having were solely attributable to the marital difficulties of her parents. The pediatrician then recommended that the plaintiff see Dr. Dornbach.
13. On or about February 22,1952, pursuant to the pediatrician’s recommendation, the plaintiff visited Dr. Dornbach, the only trained psychiatrist stationed at the 11th Field Hospital (Augsburg Post) which was an installation with limited medical facilities and, therefore, unequipped to treat mentally disturbed females. She presented a thin and nervous *326 appearance. She acknowledged her nervous state and explained that it stemmed from her domestic difficulties with her husband. Specifically, she told Dr. Dornbach that, although she had no concrete evidence of the fact, she felt certain that her husband was having an affair with the family maid as well as with the wife of a serviceman assigned to the Augsburg Post. Further, she expressed the conviction that in order to get her out of the way her husband was putting something in her drinks that caused her to go to sleep. On the basis of her appearance and conversation, which tended to ramble and was at times incoherent, Dr. Dornbach concluded that plaintiff was suffering from a paranoid condition. Accordingly, he asked her to return for another interview and indicated that in his view hospitalization of an unspecified nature would probably be necessary after he had an opportunity to discuss her allegations with her husband and consult with another doctor concerning her condition. At this meeting Dr. Dornbach did not discuss or propose marriage counseling or family counseling as a solution to plaintiff’s problems.
14. Dr. Dornbach related his medical conclusions regarding the plaintiff to Colonel Pirtle, the Commander of the Augsburg Post. Colonel Pirtle had received telephone calls at his home and office from Mrs. Burtt concerning her domestic problems and had received various complaints from his staff officers regarding similar telephone calls made to them by Mrs. Burtt. As a layman, Colonel Pirtle had concluded that Mrs. Burtt’s problem was alcohol — either excessive intake or insufficient tolerance.
15. Late in the evening of February 28, 1952, while the Burtts were at home, Harry Burtt fixed a liqueur for the plaintiff which she suspected contained a narcotic of some type. Her suspicion was not based on any physical reaction to the drink but on what she regarded as her husband’s recent pattern of unorthodox behavior. At about 2:00 A.M., she telephoned the Post dispensary to ascertain whether it was equipped to chemically analyze the drink. She was advised that the dispensary had no such facilities and did not pursue the matter further.
*327 16. The occurrence referred to immediately above was related to Dr. Dornbach the following morning by dispensary personnel. The incident was also reported to Colonel Pirtle, the Post Commander. That same morning Dr. Alva E. Miller, a colonel who was Chief of the Department of Psychiatry at the 97th General Army Hospital at Frankfurt and Consultant in Psychiatry to the Surgeon General for the European Theater, arrived at Augsburg on a routine field inspection of newly constructed medical facilities on the Post.
17. When Dr. Miller arrived at the Post, he called on its Commander, Colonel Pirtle, as a matter of military custom and courtesy. During the course of that visit, Colonel Pirtle told Dr. Miller of the plaintiff’s activities regarding use of the telephone, of the incident of the night before involving the dispensary, and of Dr. Dornbach’s conclusion that she was in a state of mental disorder. He explained that until Dr. Dorn-bach advised him of his diagnosis, he had assumed that the plaintiff’s problem was solely one of alcohol. In any event, Colonel Pirtle requested that Dr. Miller examine the plaintiff during the course of his visit.
18. Being aware of Dr. Miller’s presence on the Post and anxious to consult with him concerning the plaintiff’s condition, especially since the occurrence at the dispensary the night before, Dr. Dornbach contacted the plaintiff on the morning of Dr. Miller’s arrival and requested her to come to the Post hospital for a further interview and examination. She complied with this request.
19. At the hospital interview with the plaintiff at approximately 10:00 A.M., on February 29, 1952, Dr. Miller, Dr. Dornbach, and Colonel Salley, the Hospital Administrator, were all initially present although after the introduction had been completed, Colonel Salley left and Dr. Miller proceeded to conduct the interview and examination. Prior to the interview, Dr. Dornbach had advised Dr. Miller of the results of his earlier interview and examination of the plaintiff.
20. Dr. Miller observed that the plaintiff appeared to be underweight and she acknowledged that she had lost approximately 25 pounds during recent months. Upon oral exami *328 nation be noted evidence of a marked degree of avitaminosis, usually a symptom of lack of food associated with excessive drinking. He also observed signs of insufficient fluid intake. To ascertain her mental state, Dr. Miller touched on several of the subjects discussed by the plaintiff during her earlier interview with Dr. Dombach. Mention of these subjects caused the plaintiff to engage in a lengthy discussion dealing with: (1) her suspicions as to drugs or a poison having been placed in the liqueur recently served her by her husband; (2) her belief that her husband was having extramarital relations both with their family maid and with a neighborhood officer’s wife; (3) her apprehension that, because of her husband’s behavior, her neighbors shunned her as a suspected pervert; and (4) her suspicion that her husband had some connection with the Communists and might be either assisting their cause or planning to defect to the Communist Zone of Occupation. Under questioning by Dr. Miller, plaintiff was unable to cite any specific evidence confirming any of the aforementioned suspicions. In addition, the plaintiff recounted various instances of mistreatment by her husband that had occurred in the distant past.
21. On the basis of plaintiff’s physical appearance and the statements made by her, Dr. Miller concluded that she was on the borderline of severe malnutrition and was suffering emotional upset. He was uncertain, however, as to the extent to which these conditions were attributable to alcohol, as surmised by Colonel Pirtle. While he felt that there was likely some factual basis for plaintiff’s allegations of mistreatment by her husband, he also felt that the variety of her unsubstantiated suspicions, previously enumerated, indicated delusions of a paranoid nature. Accordingly, at the conclusion of the interview, Dr. Miller related to the plaintiff his findings to the effect that she was suffering from malnutrition and emotional disturbance. He then recommended that she enter a General Hospital, such as the 5th at Stuttgart or the 98th at Munich, for treatment of her physical symptoms and for psychiatric treatment. He made no statement as to the length of the period of confinement that would be required for this treatment. The plaintiff expressed concern for the welfare of her three children while she was away and *329 Dr. Miller replied, noting that the Burtts had a maid and that there were agencies to assist in the care of children in such circumstances, that Harry Burtt would have to assume responsibility for the children while she was hospitalized. She agreed that this arrangement would be satisfactory, whereupon Dr. Dornbach suggested that plaintiff and her husband return that afternoon to conclude arrangements for her hospitalization.
22. As to the availability of medical care and hospitalization of dependents of Army civilian employees, the applicable regulations of the Department of the Army provided as follows (AR 40-506, C5, par. ab):
Civilian employees of the Army and Air Force paid from both appropriated and nonappropriated funds, and their dependents (including librarians and hostesses appointed under authority of AR 680-50 and AR 680-60) may, in the absence of civilian facilities, be hospitalized or furnished outpatient treatment in Army medical treatment facilities outside continental United States and at those remote military installations in continental United States. Oversea commanders will determine whether civilian medical facilities are adequate and meet acceptable American standards.
23. Related regulations contain the following provisions respecting the manner in which admission of such dependents to military hospitals is to be gained:
Prior written signed request of superior officer of dependent’s principal or of patient himself.
24. At approximately 1:00 P.M., on February 29, 1952, the plaintiff returned to the Field Hospital with her husband. Before talking further with plaintiff, Drs. Miller and Dorn-bach interviewed Harry Burtt. They related some of the plaintiff’s allegations concerning his behavior and he denied each of them. He stated that for the past several months his wife had not been eating regularly, had been drinking approximately one pint of whiskey per day, and had become generally uncontrollable and prone to making various accusations against him. The doctors then told Harry Burtt that his wife was suffering from a paranoid type of psychosis and would require hospitalization at the General Hospital at either Munich or Stuttgart, whichever Burtt and the *330 plaintiff' preferred, for adequate psychiatric treatment. As to the duration of hospitalization, Dr. Miller told Harry Burtt that if alcohol was the source of his wife’s difficulty she could be released in a week’s time but if she really suffered from paranoid psychosis it was unlikely that recovery could be effected within the ninety-day period that she could be accommodated in either of the General Hospitals mentioned. Dr. Miller explained that because these hospitals were located in a potential combat zone it was the Army’s policy to evacuate to the United States any patient, military or civilian, whose cure could not be effected during ninety days of hospitalization. Accordingly, Dr. Miller advised Harry Burtt that in his wife’s case evacuation was a definite possibility, if not a probability, and that he should bear this in mind in making plans for the future. On the basis of medical diagnosis given him by the doctors, Harry Burtt agreed that his wife should be hospitalized.
25. At the conclusion of their conference with Harry Burtt, Drs. Miller and Dombach discussed the matter of plaintiff’s impending hospitalization with both husband and wife. Dr. Miller reiterated his conclusion of plaintiff’s need for hospitalization and psychiatric treatment and stated that arrangements for admission could be made immediately if the Burtts were agreeable to that procedure. Harry Burtt and the plaintiff agreed to this suggestion and both expressed a preference for the 98th General Hospital at Munich. It was further agreed that Harry Burtt, as the plaintiff’s principal, would accompany her to Munich, a distance of approximately 50 miles, for admission into the General Hospital. In direct testimony at the trial, plaintiff acknowledged her understanding that under applicable military rules and procedures all arrangements for the hospitalization and medical treatment of an overseas civilian employee’s dependents are made with the employee as the dependent’s principal or “sponsor” and affirmed that this procedure was followed in her case.
26. Although plaintiff urged the doctors that Harry Burtt should also undergo psychiatric treatment, neither Dr. Miller nor Dr. Dombach indicated that this would be done, although Dr. Miller advised the plaintiff that the doctors at the *331 98th General Hospital would undoubtedly want to talk to Harry Burtt in the course of his visits to his wife. Specifically, no suggestion was made by either Dr. Miller or Dr. Dornbach at this or any other time, that plaintiff was going to Munich for marriage counseling rather than psychiatric treatment. What plaintiff may have been told by her husband in this connection is unknown because neither party to this action called him to testify or gave any indication of having made an unsuccessful effort to do so. As a central figure in the entire factual situation with which this case is concerned, his failure to testify leaves a most significant and unfortunate void in the total pattern of proof.
27. Before the plaintiff and her husband departed from the afternoon conference, Dr. Dornbach prepared an Abbreviated Clinical Eecord, placed it in an envelope, and gave it to Harry Burtt for presentation, upon arrival later that day, at the admission desk at the 98th General Hospital. Dr. Dornbach’s remarks were as follows:
This patient has been seen twice by this examiner, and once by Lt. Col. Alva Miller EUCOM NP Consultant. She shows ideas of reference, paranoid ideation, and some disorganization of thoughts, flattening of affect.
We consider her psychotic, probably paranoid schizophrenic.
She is the wife of a DA Civ. who will accompany the patient.
Col. Miller felt evacuation to the Z.I. will be necessary, but that a short period of hospitalization should precede her return to the TJ.S. There is a long alcoholic history, patient has lost quite a bit of weight, and Col. Miller desired to definitely rule out an alcoholic type psychosis before evacuation.
_ The patient has 3 small children at home, and we consider her too dangerous to leave with them for the present.
Both the husband and the patient have agreed to this hospitalization.
Dr. Dornbach also telephoned the 98th General Hospital at Munich and advised that the plaintiff would arrive for admission later that same afternoon.
28. After leaving Drs. Miller and Dornbach, plaintiff and her husband caught the train for Munich and arrived at the *332 98th General Hospital at approximately 4:30 P.M. Little or no conversation passed between them during the course of the trip. Harry Burtt did not advise plaintiff that he was accompanying her to the Munich hospital to undergo any sort of treatment or examination himself.
29. Upon arrival at the hospital, plaintiff and her husband proceeded to the registration desk where, for approximately 15 minutes, Harry Burtt furnished all requested information and signatures while plaintiff stood aside, not paying particular attention to the substance of her husband’s statements or actions. When Harry Burtt had furnished everything requested of him at the registration desk, including the envelope containing the Abbreviated Clinical Eecord given him by Dr. Dombach at Augsburg, he departed the hospital, leaving plaintiff alone.
30. Shortly after plaintiff’s husband left, a hospital attendant escorted her to a ward marked “Neuro Psycho Ward.” The ward was divided into two parts, one for men and one for ladies. After arriving at the ladies’ section, the attendant turned plaintiff over to a lady lieutenant to whom the attendant remarked that plaintiff was “most pleasant.”
31. The ward, having no bars on the windows, consisted of a series of individual bedrooms plus a large and nicely furnished lounge and eating area. After being assigned a bedroom, plaintiff requested permission to telephone her children at home and was told by the head nurse that she could not do this without the permission of a doctor. She then j oined the balance of the lady patients at dinner.
32. At 8:00 A.M., on the morning of March 1, 1952, the plaintiff was greeted by the psychiatrist assigned to her case, Dr. Eobert Houlihan, an Army captain who was, by education and experience, a duly qualified psychiatrist. Dr. Houlihan was responsible for the care and treatment of women psychiatric patients at the 98th General Hospital. After a brief conversation with plaintiff, Dr. Houlihan went on his patient rounds and then returned to interview the plaintiff at length. She repeated all of the matters that she had previously discussed with Drs. Miller and Dombach concerning her long-standing marital strife, her convictions as to her husband’s infidelity, his tendencies towards perver *333 sion and subversion, his excessive use of alcohol, and the episode involving the drink that she felt had been drugged. Neither at this interview nor at any other time did Dr. Houli-han indicate to the plaintiff that she was admitted to the 98th General Hospital for marriage counseling or for any purpose other than physical rehabilitation and psychiatric treatment.
33. In addition to the psychiatric examinations given by Dr. Houlihan, and a psychological examination which showed her to have “Bright Normal” intelligence, plaintiff was promptly given a complete physical, the results of which were essentially negative except for disclosing that, at 108 pounds, the plaintiff was underweight. Considering the results of the physical and psychiatric examinations, Dr. Houlihan ruled out alcoholism within a week as the source of plaintiff’s illness. Rather, he believed her to be suffering from a paranoid state — a state in which she was generally oriented and coherent but tense and agitated with excessive suspicion and some impairment of normal judgment. This initial belief became his confirmed diagnosis after a period of 10-14 days’ observation and treatment of plaintiff.
34. In the light of the preliminary findings based on the results of the physical examination and the interviews conducted by Dr. Houlihan, plaintiff was placed on a program of low level insulin and vitamins to stimulate appetite and restore her physically. In addition, she received a program of occupational therapy and psychotherapy treatments administered by Dr. Houlihan. After three weeks of this routine, Dr. Houlihan found plaintiff’s mental status essentially unimproved.
35. After plaintiff had been hospitalized for approximately one week, Harry Burtt came to Munich and was interviewed by Dr. Houlihan who found him seemingly unaware of his wife’s actual mental condition and generally unconcerned about her. Thus, it was only after some insistence by Dr. Houlihan that Burtt agreed to see his wife, who was quite uneasy at the prospect of seeing her husband. During their meeting, the plaintiff insisted that Burtt produce a copy of the autopsy report on their stillborn child who had been delivered at the 98th General Hospital some two years earlier. The plaintiff suspected that the child had actually lived and *334 bad been sold or given away by her husband. Ultimately, at the plaintiff’s written request, the hospital authorities furnished her a copy of the autopsy report showing that the child had, in fact, been stillborn.
36. Notwithstanding the strained results of the first meeting between plaintiff and her husband at the hospital, he visited her approximately once a week throughout her confinement, and such visits were generally amiable. On several occasions, he was accompanied by their children. At such times, plaintiff was permitted to wear her own clothes and to go to church or to the officers’ club for meals with her family.
37. On March 18, 1952, Harry Burtt was interviewed at length by a member of the Psychiatric Social Work Section of the 98th General Hospital. He evinced a complete lack of concern for his wife’s welfare and indicated no intention of caring for her. Pie expressed complete confidence in his ability to care for the children without their mother and stated that he would have taken action to divorce the plaintiff had the medical authorities not become involved. He made it clear that, in any event, he would resort to all available means to retain custody of his children.
38. By the fourth week of her confinement, the plaintiff had become considerably less cooperative as a patient. Especially troublesome was her practice of frequently telephoning her children and upsetting and disturbing them by her remarks concerning their father’s behavior and treatment of her. In the interests of the children, and because of Plarry Burtt’s strenuous objection to these occurrences, Dr. Houlihan restricted her use of the telephone to twice a week, and then only in the evening.
39. The plaintiff had taken to extensive use of a typewriter on which she produced many writings indicative of a troubled past and of a present paranoid state.
40. In view of plaintiff’s lack of mental improvement, Dr. Houlihan secured Harry Burtt’s written permission to initiate a series of electro- and insulin-shock treatments, a recognized procedure for use in cases such as plaintiff’s.
41. By March 31, 1952, Dr. Houlihan had advised Harry Burtt that in all probability it would be necessary to evacuate his wife to the United States for further and extended *335 psychiatric treatment. Upon receiving this advice, Burtt stated that in such an eventuality he planned to have plaintiff placed in a California State mental hospital and promptly obtain another overseas assignment for himself. Even though he demonstrated no real fondness for his children, he planned, in such an event, to either keep them with him if he were able to have his mother accompany him or, if not, to place them in an educational institution outside of the State of California in order to frustrate any attempts by members of the plaintiff’s family to secure custody.
42. The possibility of plaintiff’s eventual evacuation is something that Dr. Houlihan discussed with her almost from the inception of her hospitalization and the plaintiff voiced no resistance or objection to such a procedure. She was thinking of the evacuation, however, as involving her entire family unit.
43. On April 2, 1952, at which time plaintiff was still located in the so-called “open” ward, she was accompanied by a hospital attendant to another building for a dental appointment. Before returning to the hospital, plaintiff adamantly disobeyed the attendant by going to the Post Exchange, by going to the Chaplain’s office, and by placing a telephone call to her children at Augsburg while they were in school. Upon returning to her assigned ward, plaintiff was abusive to the nursing personnel and charged that several of the nurses had designs on her husband. In the light of these occurrences, Dr. Houlihan ordered that plaintiff be transferred to the “closed” ward which, though similar to the “open” ward in general design, had bars on the windows and various other security features. In addition, patients in the “closed” ward were permitted access to no sharp objects. Visits by plaintiff’s husband and children were still permitted, however, and, in fact, continued.
44. On April 11, 1952, the plaintiff’s case was considered at the 98th General Hospital by a three-member medical board whose function it was to determine an appropriate course of further care and treatment for her. The board consisted of three doctors in the Neuropsychiatric Service of the hospital. They were: Lt. Col. Raymond L. Hack, Chief of the Service, Captain Houlihan, plaintiff’s assigned *336 physician, and Captain Bell, a staff member of the Service. After interviewing the plaintiff and considering all clinical records, including laboratory findings and the results of physical and mental examinations, the hoard diagnosed plaintiff’s status as:
Paranoid state, chronic, moderate, manifested by delusions of persecution and of bizarre sexual behavior in her family circle in a highly inhibited, inadequate and indecisive woman. Predisposition: Severe. Stress: Moderate. Degree of Incapacity: Severe. * * * COCC [Condition]: Unimproved.
On the basis of this diagnosis, the board recommended that plaintiff be evacuated to the United States, and this recommendation was duly approved by Colonel Gardner, the Commanding Officer of the 98th General Hospital. Although he joined in the unanimous board recommendation for evacuation of the plaintiff, Dr. Houlihan was firmly of the view that the entire Burtt family, and not just the plaintiff, should be returned to the United States.
45» Upon learning of the board recommendation concerning his wife’s evacuation, Harry Burtt wrote the following letter, dated April 24,1-952, to Colonel Pirtle, the Commanding Officer of the Augsburg Post:
1. In endeavoring to arrange my affairs following information that steps are being taken to return my wife to Letterman General Hospital the following assistance is asked from you as Commanding Officer. In the absence of any written prognoses or diagnoses my plans are -being formulated on contingencies of my wife’s condition and prognosis for cure, specific information on which I have received only verbally from Lt. Col. Hack and Capt. Hoolohan [sic], medical officers treating her.
2. I have been informed a prognoses for an early, or certain cure, is not in evidence at this time and that continued treatment over an indefinite period of time is believed necessary. If, however, there is any possible reason or believe [sic] that a possible prognosis is for a cure within a few months I would ask that you inquire whether or not EUCOM would reconsider its decision of returning her to San Francisco. If possible, could it be arranged that Lt. Col. Miller, the EUCOM advisor on matters of psychiatry again examine Mrs. Burtt and following that Í would like to speak with him. It is *337 not that I do not have confidence in the two doctors presently treating her that I make this request; it is to, if possible, further explore the possibility of having her permitted continued treatment here.
3. In the event of a negative reply to the first request (and from information I have received I have small hope for a favorable decision). My plans for a transfer of my wife to San Francisco must be made with certain considerations given to the better interests of three children. I hope I need not state that if I were alone there would be no hesitancy on my part to return with her immediately. Even, in her present condition she is very alert to the undesirable features of immediate movement of the children. Although her judgements may not presently be necessarily trustworthy, in talking with her, since she was informed that she was returning, she strongly urged that the children and I remain here until she is cured. (She, of course, believes, that one week or so in Letterman, she will be released). I mention this only to point out that I do not believe the subsequent requests will be to the disinterest of my wife’s progress in recovery but would possibly contribute to it.
4. Some contingencies I cannot anticipate. Plans for caring for the immediate problem are as follows. I have wired my brother in San Francisco who has a business and owns a home in the bay area, advising him of my wife’s return. I have placed a telephone call to him which will be made following his receipt of my telegram. I am sending him papers of power of attorney to act for me in the transfer of my wife to a desirable state instruction [s¿?]. I have also outlined my plan to Capt. Hoolohan [sic] and to Col. Hack, neither of whom seemed to object.
5. As you are aware I may leave the EUCOM Command, having completed a minimum tour of two years, with return to my home station. In leaving it can be under one of two conditions:
a. Completed duty tour, and no indicated return.
b. Completed duty tour, sign a new two year agreement, which would warrant a 60 days leave to absence in the states and then return to duty station.
It is requested that I be permitted to set a target of two months ahead for return. This would be approximately June 30, after the children are out of school.
It is also requested that I be permitted to sign for another two years tour after a sixty days leave in Z.I.
*338 Prior to making this request I have reviewed all possible alternates and I am convinced this is best for all members of the family, and will not be to the disinterest of any one member.
46. The plaintiff acquiesced in Harry Burtt’s suggestion that she be evacuated while he and the children remain in Augsburg until the end of their current school term. Her agreement, however, was predicated on the assumption that her husband would be required to return to the United States with the children at that later date.
47. On May 7, 1952, plaintiff completed the course of insulin shock treatments that had been prescribed for her and on May 10,1952, she departed the 98th General Hospital for the 97th General Hospital at Frankfurt, the European Command point of embarkation for transportation of hospital patients to the United States. In accordance with established Army medical procedures, plaintiff was moved by stretcher from her ward to a waiting ambulance and thence by hospital train to Frankfurt where the same procedures were again employed.
48. Plaintiff remained in the 97th General Hospital for approximately one week awaiting available air transportation. On several occasions while there she saw Hr. Alva Miller, the psychiatrist who had consulted with Dr. Dom-bach at Augsburg, several times. He did not perform any professional examination of the plaintiff but observed that she looked far healthier, and approximately 20 pounds heavier (which, in fact, she was), than when he had seen her at Augsburg in February. He did not, however, believe that she had recovered her mental health. During her stay in the Frankfurt hospital, Dr. Miller arranged for the plaintiff to speak with her husband by telephone at Augsburg.
49. Plaintiff departed Frankfurt in a 60-patient hospital plane of the Military Air Transport Service and arrived at Letterman Army Hospital in San Francisco on May 22,1952. As a patient with her particular type of mental disorder, plaintiff made the flight as a stretcher case. This was in accordance with established Army medical procedures designed for the security and comfort of the patients as well as the medical personnel who travelled with them. Experience had *339 demonstrated that mental patients were prone to nndne stress and upset when traveling by aircraft and hence the adoption of these procedures.
50. As Harry Burtt had indicated in his letter of April 24, 1952 to Colonel Pirtle,[1] he contacted his brother, George, who resided in the San Francisco area, and made arrangements with him, including forwarding him a power of attorney, to secure a court order for the plaintiff’s commitment in a state institution. The authorities at Letterman had been advised of this plan prior to plaintiff’s arrival there. Accordingly, when she arrived she was not admitted as a patient. Instead she was taken by ambulance to the San Francisco City and County Hospital and admitted at 8:15 P.M., on May 22, 1952. Upon admission, she was quiet and cooperative. The results of a routine physical examination were essentially negative.
51. Immediately following plaintiff’s hospital admission, above described, George Burtt filed a petition with the California Superior Court for the City and County of San Francisco, alleging that plaintiff was mentally ill and in need of supervision and care and seeking issuance of an order for her commitment.
52. On May 26, 1952, acting on the petition of George Burtt, the Superior Court issued an order to the San Francisco City and County Hospital directing that plaintiff be detained for examination and a further hearing on the question of her mental illness.
53. On May 27, pursuant to the court’s order, plaintiff was transferred to the Psychiatric Division of the hospital for examination.
54. In May 1952, the Clinical Director of Psychiatry at the San Francisco City and County Hospital was Dr. Baymond M. Brown. On May 27 and 28, plaintiff underwent psychiatric examination by Dr. Brown and members of his staff. In the course of this examination, which covered her entire life experience, plaintiff related her long-standing marital difficulties with her husband, referring principally to his general propensities for liquor and gambling and *340 consequent irascibility towards both herself and their children. Specifically, she repeated her conviction that on the night of February 28, 1952, he had attempted to serve her a poisoned drink.
55. On the basis of the psychiatric examination conducted by himself and his staff, and considering the content of plaintiff’s Army hospital records which were available to him, Dr. Brown diagnosed plaintiff’s condition to be that of a paranoid state — generally described as attributing subjective feelings and complaints to external forces. He also felt, however, that a shift in environment, away from her husband, and therefore removed from what appeared to be her major source of stress, would be beneficial. Plaintiff’s mother, who resided in the area, had advised the hospital of her willingness to provide a home for the plaintiff.
56. Having reached his diagnosis and prognosis in the manner indicated, Dr. Brown wrote the following letter, dated May 28,1952, to the Superior Court:
The patient was transferred from Detention to Psychiatric on May 27 for further evaluation.
See detailed report from an overseas hospital.
Apparently, she has had an overt psychotic break for which she received appropriate treatment and now although her basic personality remains unchanged, her psychosis is in sufficient remission so that no overt delusions were elicited. Apparently, some of the participating factors were situation difficulties from which she is now separated, therefore, it is recommended that a trial outside adjustment be made under the care of her own family and that she be followed by out-patient psychiatric treatment.
57. On May 29, 1952, after a hearing in open court, at which plaintiff was present, Judge Eustace Cullinan of the Superior Court issued an order declaring plaintiff not mentally ill and discharged her from custody.
58. After her discharge from custody, plaintiff took up residence with her mother and, on July 23,1952, secured employment as a typist and file clerk in the San Jose office of the Food Machinery and Chemical Corp. Her work in this position was highly satisfactory and she advanced to the position of a stenographer. She remained with this com *341 pany until December 15,1954, at which time she took a leave of absence from which she did not return. Throughout her employment at Food Machinery, plaintiff was regarded by her superiors and co-workers as a pleasant, efficient, and well-adjusted person. In May 1960, at the time of the first trial session in this case, plaintiff was employed as a secretary in the Atomic Power Equipment Department of the General Electric Company.
59. Following her release from custody in May 1952, plaintiff promptly initiated efforts to have her children returned to her in the United States. To this end, she sought the assistance of the military authorities, of the Juvenile Court in San Jose, and of the Eed Cross, all to no apparent avail. She repeatedly endeavored to reach her children by long distance telephone at Augsburg but succeeded only in reaching her husband, against whom she had filed a California action for divorce.
60. In July 1952, plaintiff sought the assistance of a psychiatrist, Dr. Bradshaw, who was associated with the Adult and Child Guidance Clinic at San Jose, in securing the return of her children. In September 1952, he wrote Harry Burtt, advising him that plaintiff evidenced no psychiatric illness of sufficient severity to warrant further separation of herself from her children.
61. At one point she learned, in response to one of her letters to Harry Burtt’s commanding officer at Augsburg, that Burtt had been reassigned to Kaiser, Germany, and had moved there with the children.
62. Finally, the plaintiff secured an order from the Superior Court of Santa Clara County awarding her custody of her children. This order was forwarded to the United States military authorities in Germany but proved ineffectual because of jurisdictional defects stemming from Harry Burtt’s overseas status.
63. Having unsuccessfully exhausted all avenues known to her, plaintiff took a leave of absence from her job at Food Machinery in December 1954, and went to Germany in an effort to rejoin her children and secure custody of them.
64. Plaintiff located her husband and children in Germany and remained with them there until March 1955, when the *342 Army returned tlie entire family to New York. After Harry Burtt’s unsuccessful effort to spirit the children away, the plaintiff took her two daughters to California where they were later joined by her son. They have continued to reside together, the plaintiff having been awarded legal custody.
65. Harry Burtt resigned his civilian position with the Army in April 1955.
66. Two private relief bills on plaintiff’s behalf have been introduced in the Congress. Neither was adopted.
67. Considering all of the evidence, it is clear that the plaintiff experienced overwhelming mental stress as a result of her husband’s general behavior and particular treatment of her. This stress was so severe and protracted that it finally induced paranoia which reached its extreme on the night of February 28,1952, with the poisoned drink episode.
68. Those persons who had social contact with the plaintiff in the United States, both before and after her stay in Germany, found her to be an alert, capable, pleasant, and stable person who gave no evidence of paranoid or psychotic tendencies.
69. At the trial, plaintiff testified in a wholly forthright manner, leaving no doubt of her firm belief in the entire truth of her testimony, notwithstanding its direct conflict with the weight of the evidence. That she could so testify with complete subjective honesty is explained by a process of mental repression which has erased from her mind many of the actual details of a highly distressing series of occurrences and their immediate aftermath.
CONCLUSION OF LAW
Upon the foregoing findings of fact and opinion, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is not entitled to recover, and her petition is therefore dismissed.

The opinion, findings of fact, and recommended conclusion of law are submitted under tlie order of reference and Rule 57(a).

 The parties agreed, as authorized by Rule 47(e)(1), thait the trial should be limited to the issue of plaintiff’s right to recover, with determination of the amount of recovery, if any, reserved for further proceedings.

 Ch. 369, 24 Stat. 505.

 Ch. 753, 60 Stat. 843.

 Even in a case -with those tortious overtones, this court has intimated that it has jurisdiction to pass on the claim as one for breach of the Government’s contractual obligation to provide its employees with adequate medical service. See Booth v. United States, 140 Ct. Cl. 145, 155 F. Supp. 235 (1957), where it was apparently only the expiration of the statute of limitations that occasioned this court’s consideration of the claim as a congressional reference matter.

 Finding 45, supra.