Helen M. BOOTH

v.

The UNITED STATES.

No. 50105.

United States Court of Claims.

Oct. 9, 1957.

———◆———

Harry I. Rand, Washington, D. C., for plaintiff.

Edward L. Metzler, Washington, D. C., with whom was Asst. Atty. Gen. George Cochran Doub, for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

LITTLETON, Judge.

Plaintiff brought suit against the United States (acting through the medical personnel of the United States military government in Germany) for malpractice, alleging that her husband's death was caused by the failure of the Army medical personnel to use reasonable care and skill in diagnosing and treating her husband's condition, thereby

breaching the contractual obligation which the Government had assumed toward her husband.

The essential facts of this case are as follows: The deceased, hereafter referred to as "Booth", was, for some time prior to and at the time of his death, a civilian employee of the United States War Department with his duty station in Nuremberg, Germany. In September of 1945, Booth had applied for overseas employment with the Office of Military Government in Germany and at that time certified on his application that he did not have "any physical defect or disability whatsoever." Upon examination he was found by the Army medical personnel to be physically and mentally qualified for overseas service. Unknown to the governmental authorities at that time, Booth had had a long medical history of stomach trouble. While still a student at the University of California, he had been examined and treated in 1942 at the University's Cowell Memorial Hospital, and the hospital's records reveal a medical history of a "nervous stomach" for over 15 years during which time phenobarbital and belladonna had been used for relief. The hospital made a diagnosis of the probable existence of a small duodenal ulcer with no ulceration or malignancy.

Booth went overseas October 13, 1945 and was assigned to the Office of the United States Chief of Counsel at Nuremberg, Germany, but he spent a substantial amount of time on temporary duty in Berlin during the summer of 1946 and was in Berlin occasionally during the fall of 1946.

The standard form contract between Booth and the War Department under which the malpractice claim is made provided as follows:

"Necessary medical care and hospitalization, as may be currently established, will be provided through United States Army facilities at no cost to Employee."

During the period of Booth's employment, there was also in existence a directive of the Quadripartite Military Government purporting to forbid civilian employees of the allied powers in Germany from going to civilian physicians for medical services. To provide medical services for its civilian and military personnel, the United States Army maintained dispensaries, clinics, and hospitals in both Nuremberg and Berlin where Booth worked, and the Army also maintained a Consultants Division composed of a medical and a surgical consultant to whom patients could be referred when the individual Army doctor felt that such reference was advisable.

After his arrival in Germany, Booth continued as previously to suffer gastrointestinal discomfort. In a letter of November 7, 1945, he wrote to his wife that "Gas troubles are as painful as at any previous time," and he requested that she send him certain medications. On May 3, 1946, a medical officer at the dispensary at the Office of U. S. Chief of Counsel in Nuremberg addressed a note to the "mess sergeant" stating that it was "medically necessary" that Booth receive milk and no greasy foods such as fried eggs with his meals. Booth carried this document with him when taking his meals at the mess in Nuremberg. About a month later Booth again went to the dispensary with gastrointestinal complaints and was referred to the medical clinic in Nuremberg. It is not known whether or not Booth went to the clinic at that time.

Booth spent the summer months of 1946 on temporary assignment in Berlin where his wife joined him on July 2. Plaintiff found that her husband had lost weight and was still suffering stomach pains. On July 11, 1946, Booth visited a dispensary in Berlin and was examined by Captain Guemmer, a medical officer, who noted that Booth's condition sounded like a "psychosomatic complaint all around, except that there is a definite intolerance to fatty foods." Captain Guemmer referred Booth to the X-ray department of the United States Army Hospital in Berlin for "GI series and g. b. visualization" (X-ray of the upper gastrointestinal tract and gall bladder

visualization by X-ray). These tests were made in August 1946 with negative results in that no organic disease was disclosed. Booth continued to suffer pain, and when that fact was reported to Captain Guemmer on or about August 27, 1946, he noted that Booth was going to Nuremberg at present but that he would send Booth to the clinic in Berlin upon his return. Booth stayed in Nuremberg during the late summer and most of the fall with occasional business trips to the Ruhr region and to Berlin. During this period Booth went to the Army dispensary in Nuremberg but there is no record of what occurred during such visit or visits. Booth continued to have stomach pains, lost weight, became more irritable and nervous, and his physical condition adversely affected his work.

When Booth went back to Berlin to spend the Christmas holidays with his wife, he again visited Captain Guemmer who sent him to the medical clinic "for re-check". Booth went to the clinic and saw First Lieutenant Robert A. Broome, Jr. on December 20, 1946. He told Lieutenant Broome that he had been troubled by gas for several years, that the character of his difficulty had not changed, and that he was not aware of any loss of weight. Lieutenant Broome did not have any X-rays made after learning that the X-ray tests performed in August of that year at Captain Guemmer's direction were negative. Lieutenant Broome made a tentative diagnosis of functional aerophagia (air swallowing) and advised Booth to try to avoid swallowing too much air. He gave Booth some medicine and told him to let him know if the symptoms were not relieved. During the rest of the period he spent in Berlin during the holidays, Booth's discomfort did decrease as a result of a bland diet, bed rest, and the medication prescribed by Lieutenant Broome.

While he was in Berlin at this time, Booth went to a German radiologist who made some X-rays of Booth's gastrointestinal tract. These X-rays did not indicate any organic disease. Booth returned to Nuremberg, and there consulted a German physician, Professor Bingold, who also had X-rays made of Booth's gastrointestinal tract. These X-rays did not reveal any organic disease or abnormality, but did show an enlargement of the lining of Booth's stomach. Professor Bingold advised Booth to go to Switzerland for a rest. Booth secured a 30 day leave of absence and on February 8, 1947 drove his car from Nuremberg to Zurich, where he entered the Bircher-Benner Clinic as a patient. On February 16, 1947 Booth had a massive hemorrhage and hemorrhaging continued until Booth's death. Professor Oskar Winterstein, a Zurich surgeon specializing in stomach surgery, was called in after the massive hemorrhage, and made a diagnosis that it was highly probable that Booth had a cancer in the stomach. After plaintiff arrived at her husband's bedside, she urged Professor Winterstein to operate but he refused, and, at plaintiff's request, the United States military authorities in Germany sent to Zurich a noted German surgeon, Professor Ferdinand Sauerbruch. Assisted by Professor Winterstein, Professor Sauerbruch performed a phrenicotomy on March 6, 1947 to relieve the severe abdominal pain. On March 10, 1947 Booth was transferred from the Bircher-Benner Clinic to the Red Cross Hospital in Zurich. Two days later Professor Sauerbruch performed a second operation in which he opened the abdominal cavity and discovered the existence of a dish-shaped carcinoma (or cancer) on the lesser curvature of the stomach at the cardia. Removal of the carcinoma was not possible at that time because of Booth's great loss of blood and consequent extreme exhaustion. Booth died on March 19, 1947 as a result of carcinoma and complications resulting from it.

Plaintiff based her action upon the theory that the United States was legally obligated to provide necessary medical care for her husband and that the United States, acting through its Army medical personnel in Germany, breached that duty by failing to use reasonable and proper skill and knowledge in diagnosing

238

the disease from which the deceased was suffering, and negligently diagnosed his condition as aerophagia or minor indigestion. Plaintiff further alleges that as a result of this negligence, the cancer grew to such proportions that surgery was required and Booth died from cancer of the stomach and post-operative complications, and that his death was caused solely by the negligence of the Army medical authorities and physicians.

Jurisdiction to hear and decide this case was conferred upon this court by a special act of Congress, Private Law 863, 81st Congress, 2d Session, 64 Stat. A191, which reads as follows:

"That jurisdiction be, and it is hereby, conferred upon the United States Court of Claims to hear, determine, and render judgment upon the claim of Helen M. Booth against the United States for compensation on account of the alleged failure of the United States military government in Germany to provide medical treatment to her deceased husband, Alfred H. Booth, who died on March 19, 1947, in Zuerich, Switzerland: *Provided*, That proceedings for the determination of said claim shall be had in the same manner as in cases of which said court has jurisdiction under the provisions of section 1491, title 28, United States Code, as amended: *And provided further*, That suit hereunder shall be instituted within one year after the enactment of this Act: *Provided, however*, That the passage of this Act shall not in any way be construed as an inference of liability on the part of the United States Government."

The United States did have a legal obligation to furnish its civilian employees in Germany necessary medical service. That was clearly one of the terms of the employment contract entered into between such employees and the United States. To satisfy that contractual obligation, the United States, acting through the medical personnel of the United States military government

in Germany, was obligated to meet the same standard of care as any other physician contracting to render medical service. That standard is usually stated to be such "reasonable and ordinary care, skill, and diligence as physicians and surgeons in good standing in the same neighborhood, in the same general line of practice, ordinarily have and exercise in like cases." 41 Am.Jur. (Phys. & Surg.) § 82, p. 201. Failure to meet that standard would be malpractice, which can be defined as "bad or unskillful practice on the part of a physician or surgeon resulting in injury to the patient." 70 C.J.S. Physicians and Surgeons Subd. V, § 40. Lack of skill or care in diagnosis as well as in treatment is malpractice. Kuechler v. Volgmann, 180 Wis. 238, 192 N.W. 1015, 31 A.L.R. 826. See also 41 Am.Jur. (Phys. & Surg.) § 92, pp. 209–210. Although a physician or surgeon is liable for a failure to diagnose correctly if such failure is due to a lack of required skill or care, if he does use the proper degree of skill and care, he is not liable for a mistake in diagnosis.

While the Army medical personnel in Germany, in their medical care and treatment of Booth, had to exercise that degree of care and skill ordinarily exercised by the medical profession in similar cases, it did not have to exercise extraordinary skill and care or the highest degree of skill and care possible, and so long as the requisite skill and care were used, a mistake in diagnosis was not malpractice. There is no evidence that the medical procedures followed by the Army medical authorities were not the standard and accepted procedures for a case such as Booth's. The medical procedures outlined by plaintiff's expert witness, Dr. William M. Ballinger, might very well have been the ordinary and reasonable standard for a highly skilled specialist, because the law demands a higher degree of skill and care in the case of a specialist. Had cancer been suspected in Booth's case, the United States would have been obligated to secure the services of specialists who no

doubt would have used the diagnostic techniques suggested by Dr. Ballinger, and failure to use such techniques would have been malpractice. However, cancer was not suspected, and the Army doctors were not negligent in failing to suspect the existence of a cancerous condition in view of Booth's past medical record and the unchanging nature of his complaints. In 1945 before Booth went overseas, he admitted to a private physician that he had had his gastrointestinal difficulties for "about 23 years". Booth either did not think his condition was serious or he deliberately withheld information as to his condition when he applied for overseas employment. The Army medical personnel did not fail to take reasonable steps to determine Booth's condition. The "GI series and g. b. visualization" ordered by Captain Guemmer had negative results, but since Booth continued to complain, Captain Guemmer decided to send Booth back to the Army medical clinic upon Booth's return to the city. Booth did not return to Captain Guemmer until December 19, 1946, and Captain Guemmer sent him to the clinic for recheck the next day. Nothing in Captain Guemmer's actions can be considered to be less than ordinary and reasonable skill and care. The diagnosis and treatment which Booth received from Lieutenant Broome at the clinic cannot be said to depart from the standard of care required. In view of the unchanging nature of the complaint and the fact that X-rays had been made less than six months earlier and with negative results, it was not negligent for Broome to fail to have another series of X-rays made. Although the tentative diagnosis of aerophagia was incorrect and, even if negligently arrived at, it was merely a working diagnosis subject to confirmation, if Booth did not respond to the medication prescribed.

The medical treatment given by the Army medical personnel was of the same standard as that of other reputable private physicians practicing in the same general area. This is indicated by the fact that the X-rays made by the German radiologist also failed to reveal the presence of cancer, and the X-rays made by Professor Bingold showed no organic disease. Professor Bingold did not suspect the existence of cancer and merely ordered Booth to go to Switzerland for proper diet and rest.

It was not until the massive hemorrhage occurred that stomach cancer was suspected. It is not known when the cancer began to develop, because cancer of the stomach does not produce symptoms for a period of time after its first appearance. The location of Booth's cancer made it difficult to discover. In view of Booth's long history of stomach trouble, the unchanging nature of his complaint, and the nature of cancer itself in its early stages, there was no reason to suspect the existence of cancer. It was only when the carcinoma had ravaged Booth's body to the point of involving a blood vessel with resulting hemorrhage that cancer was suspected. With the advantage of hindsight, it may be said that an endoscopic investigation (gastroscopy) or an exploratory operation (laparotomy) might have earlier disclosed the cancer in time to save or at least prolong Booth's life, but there was no reason for the government physicians to suspect the existence of cancer and to warrant such extreme diagnostic measures. The Army medical personnel, in view of the data reasonably available to them, did not fail to afford Booth the standard and accepted medical care and treatment.

We have found no malpractice in this case, and it therefore becomes unnecessary to discuss plaintiff's arguments as to proximate cause and the amount of damages suffered by her. The United States did not breach any duty owed to the deceased, and the petition is dismissed.

It is so ordered.

JONES, Chief Judge, and MADDEN, and WHITAKER, Judges, concur.

LARAMORE, Judge, took no part in the consideration and decision of this case.