June B. PITT, Executrix of the Estate of Bruce Wilson, Deceased,

v.

The UNITED STATES.

No. 159–61.

United States Court of Claims.

Jan. 23, 1970.

Lawrence J. Simmons, Washington, D. C., attorney of record, for plaintiff.

Charles M. Munnecke, Washington, D. C., with whom was Asst. Atty. Gen. William D. Ruckelshaus, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

### PER CURIAM:

This case was referred to Trial Commissioner George Willi with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 134(h). The commissioner has done so in an opinion and report filed on September 17, 1969. Plaintiff has filed no notice of intention to except and the time for so filing under the rules of the court has expired. On November 6, 1969, defendant moved that the court adopt the commissioner's findings of fact, opinion and recommendation to which plaintiff has filed no opposition and the time for so opposing under the rules of the court has expired. Since the court agrees with the commissioner's opinion, findings and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case without oral argument. Therefore, plaintiff is not entitled to recover and the petition is dismissed.

### OPINION OF COMMMISSIONER

WILLI, Commissioner:

This case was tried after Bruce Wilson died from causes unrelated to any of the issues presented herein and after the court denied a motion to dismiss for lack of jurisdiction and two separate motions for summary judgment by defendant. The nominal plaintiff, by substitution duly made, is Wilson's executrix. For convenience, however, Wilson will be referred to herein as the plaintiff.

Two basic claims are presented. First, it is contended that plaintiff is due pay for the period August 21, 1956 to January 24, 1965, the date of his death, and second, that he is entitled to damages for the Army's breach of a contract with him to provide medical care.

The facts, summarized herein, are detailed in the findings of fact accompanying this opinion.

Plaintiff's entire federal career, which began in 1942, was spent working for the Army as a civilian clerical employee at

various domestic and overseas locations. In 1949, pursuant to a 2-year employment contract that included a medical care clause to be later discussed, he went to Germany as an auditor in the Army's European Headquarters at Berlin. His satisfactory performance of those duties led to a promotion in 1955 and a transfer to the Comptroller's Office of the Berlin Command where he served as a supervisory accountant. He served equally satisfactorily in that position and was well regarded by his superiors and those with whom he worked.

In June 1956, following an investigation and report by the Army's Criminal Investigation Division, plaintiff was placed under military arrest on charges of having committed various homosexual and lewd acts, some of which involved minors. At that time the Army's general policy for dealing with cases of alleged perversion by its civilian employees called for no more than administrative termination of employment, by resignation or otherwise. The Army authorities regarded plaintiff's case as beyond the general policy, however, because of the involvement of minors. It was accordingly determined that he should be court-martialed. Because of his employment status plaintiff was not subject to either the civil or criminal jurisdiction of the Berlin courts. United States v. Wilson, 9 USCMA 60, 61 (1958).

When the personnel officer of the Berlin Command learned that plaintiff was to be court-martialed he withheld affirmative administrative action for plaintiff's removal from the employment rolls pending completion of the court-martial proceeding.

Plaintiff was placed under arrest on June 22, 1956, and confined in the Berlin Army Hospital rather than in a regular detention facility. This was in keeping with the Command's policy for detention of officer personnel, whether or not ill, awaiting court-martial trial. Aside from the posting of an unarmed guard in the corridor outside his room, it appears that plaintiff was in a patient rather than prisoner status. Promptly after admission, he underwent a series of medical and psychiatric examinations. The medical tests and examinations were essentially negative. Although X-rays showed evidence of earlier tuberculosis, sputum tests were negative as to any current TB infection. The Army psychiatrist found plaintiff to be mentally competent.

On June 25 and 27, 1956, plaintiff was formally served at the hospital with charges and specifications alleging violations of Articles 125 and 134 of the Uniform Code of Military Justice.

Faced with the serious charges that had been lodged against him, plaintiff engaged a personal attorney and a psychiatrist, both of whom were highly capable. The attorney, a bilingual German National, had fled Germany after the Reichstag fire and practiced law in this country as a member of the Massachusetts bar until after World War II when he returned to Germany and resumed his practice there.

The civilian psychiatrist had an excellent reputation in his field, and the trial was delayed at plaintiff's request in order to permit him to undergo examination by his own specialist.

The unfolding legal climate on the question of court-martial jurisdiction over civilians in time of peace prevailing and developing at the time of plaintiff's pretrial hospital confinement is of significance in assessing subsequent developments in the case.

In November 1955, the Supreme Court decided in Toth v. Quarles, 350 U.S. 11, 76 S.Ct. 1, 100 L.Ed. 8, that five months after his honorable discharge an ex-serviceman could not be constitutionally subjected to a court-martial trial on a charge of murder allegedly committed while he was an airman in Korea.

On June 11, 1956, by a 5–4 vote, the Supreme Court upheld the constitutionality of Article 2(11) of the Uniform Code of Military Justice as applied to the court-martial convictions of two civilian wives accompanying their husbands serving in the armed forces overseas in time

of peace. Kinsella v. Krueger, 351 U.S. 470, 76 S.Ct. 886, 100 L.Ed. 1342; Reid v. Covert, 351 U.S. 487, 76 S.Ct. 880, 100 L.Ed. 1352. On November 5, 1956, the Court granted petitions for rehearing in these cases, 352 U.S. 901–902,[1] 77 S.Ct. 123, 1 L.Ed.2d 92 and on June 10, 1957, under a plurality opinion of four, joined by two Justices concurring specially on the ground that capital offenses were involved, the original decisions were reversed. Reid v. Covert, 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148. Ultimately, in January 1960, the Court came full circle and, on review of habeas corpus proceedings involving plaintiff [2] and another, held unconstitutional, by a 5–4 vote, an overseas court-martial trial of civilian employees of the armed forces charged with noncapital offenses in time of peace. Wilson v. Bohlander (*sub nom.* McElroy v. United States ex rel. Guagliardo), 361 U.S. 281, 80 S.Ct. 305, 4 L.Ed.2d 282.

▮ In sum, at the eve of plaintiff's trial set for August 21, 1956, it was legally settled that one with no current connection with the military could not be constitutionally subjected to a court-martial trial for a capital offense. Fur-ther, it had been decided by the narrowest of margins that a dependent accompanying a member of the armed forces overseas was constitutionally amenable to trial by court-martial for a capital offense in time of peace. Though it was ultimately decided that the constitutional guarantee of trial by an Article III court with Fifth and Sixth Amendment protections extended to the military's civilian employees on all criminal charges, capital and noncapital, it is clear that at the time that charges were preferred against plaintiff, the question of court-martial jurisdiction over civilian employees for non-capital offenses was so far from its ultimate resolution that no bad faith can reasonably be imputed to the Army for pursuing the court-martial route with plaintiff. In short, it cannot be said that in dealing with plaintiff as it did, the Army was doing anything more than what it reasonably believed it had a legal right to do.

On the afternoon before plaintiff's scheduled trial his civilian attorney delivered the following paper to the Civilian Personnel Office of the Berlin Command:

BRUCE WILSON                                    August 17, 1956

CIVILIAN PERSONNEL OFFICER
BERLIN COMMAND
APO 742 U. S. ARMY

SIR,

I hereby wish to notify you that I resign my position with the Berlin Command effective 17.00 hours 20 August 1956.

Sincerely,

S/ BRUCE WILSON

BRUCE WILSON

———◆———

1. In the order granting the rehearing the Court invited discussion by counsel on reargument of four specified questions. Two of them were: "The relevance, for purposes of court-martial jurisdiction over civilians in time of peace, of any distinctions between civilians employed by the armed forces and civilian dependents"; and "The relevance, for purposes of court-martial jurisdiction over civilian dependents overseas in time of peace, of any distinctions between major crimes and petty offenses."

2. A district court had denied plaintiff's petition for a writ of habeas corpus. United States ex rel. Wilson v. Bohlander, 167 F.Supp. 791 (D.Colo.1958).

The Staff Judge Advocate was promptly advised of plaintiff's resignation and he and the trial counsel assigned to prosecute plaintiff's case both attempted, unsuccessfully, to persuade the Civilian Personnel Officer to defer the effective date of acceptance of the resignation until after the conclusion of the court-martial proceedings. They both took this position because they apprehended that by a voluntary act of acceptance of the tender according to its terms, the Army might be deemed to have waived its right to assert continuing jurisdiction over plaintiff as an employee. Although the Civilian Personnel Officer felt that the applicable personenl regulations made acceptance of a civilian employee's resignation, according to its terms, mandatory, it was agreed that advice in the matter would be sought from higher headquarters. This was done, and the Civilian Personnel Officer's view as to the requirement of the regulations was formally confirmed on September 7, 1956.

At the outset of the trial on August 21, 1956, plaintiff's counsel moved to dismiss the charges for lack of jurisdiction, contending that by his resignation the previous day plaintiff had effectively severed all connection with the Army and had therefore placed himself in the same position as the discharged serviceman, Toth. The motion was denied, and plaintiff thereupon entered a plea of guilty to all charges and specifications. After entry of the plea, opinion affidavits by the Army psychiatrist and plaintiff's own psychiatrist were introduced in evidence prior to sentencing. Both doctors found plaintiff to be a psychopathic personality on the borderline of schizophrenia. Both agreed, however, that he was mentally sane. After consideration of these affidavits, certain other documents from plaintiff's work record, and argument from counsel, the court sentenced plaintiff to 10 years' confinement. On August 23, 1956, the convening authority affirmed the conviction but reduced the sentence to 5 years. On August 27, 1956, plaintiff was re- moved from the Berlin Army Hospital to the Mannheim Stockade.

On September 13, 1956, after confirmation from the Army's Commander-in-Chief for Europe as to the binding effect of a civilian employee's resignation, a Form 50, Notification of Personnel Action, was issued plaintiff reflecting his separation from Army employment, effective August 20, 1956, by reason of and in accordance with the terms of his resignation.

Plaintiff's claim for back pay depends upon the validity of his resignation. He contends that it was void because submitted in response to an unconstitutional criminal proceeding brought against him. In these circumstances, it is urged, the resignation was involuntary as a matter of law.

In McGucken v. United States, 407 F.2d 1349, 187 Ct.Cl. 284, cert. denied, 396 U.S. 894, 90 S.Ct. 190, 24 L.Ed. 2d 170 (1969), this court dealt extensively with the question of voluntariness as related to the validity of a proffered resignation. Holding that the involuntary nature of a resignation arises from external coercion and duress, basically factual issues, the court announced its standard of voluntariness as being the absence of duress. It then defined that standard as follows (*Id.* at 289, 407 F.2d at 1351):

> * * * three elements are common to all situations where duress has been found to exist. These are: (1) that one side involuntarily accepted the terms of another; (2) that circumstances permitted no other alternative; and (3) that said circumstances were the result of coercive acts of the opposite party. * * * Fruhauf Southwest Garment Company v. United States, 126 Ct.Cl. 51, 62, 111 F.Supp. 945, 951 (1953).

Though the element of unconstitutionality present in this case entitles plaintiff's contentions to most careful consideration and justifies the resolution of all reasonable doubt in his favor, it

cannot be said that under this court's established standard his resignation was involuntary. Moreover, any subsisting doubt as to plaintiff's voluntariness at the time that he submitted the resignation is convincingly dispelled by his conduct in relation to it thereafter.

Undeniably, the event preempting plaintiff's attention and concern at the time that he submitted his resignation was the imminent criminal trial and the severe penalties that could flow from it.

In terms of timing at least, it cannot reasonably be disputed that the resignation (coming, as it did, on the eve of scheduled trial) was motivated by plaintiff's desire to defeat court-martial jurisdiction by immediately and completely severing his employment connection with the Army.

Finally, in assessing the voluntariness of the resignation when submitted, the court-martial proceeding must, as a matter of law, be recognized as unconstitutional at that time. It cannot be treated as a proceeding, valid when held, that simply became unconstitutional in 1960 when the Supreme Court rendered its decision. Linkletter v. Walker, 381 U.S. 618, 628, 85 S.Ct. 1731, 14 L.Ed.2d 601 n. 13 (1965).

If the above factors are considered in isolation, the case for involuntariness seems appealing. That initial impression is tempered, however, when those factors are examined in depth and in the context of the total situation that prevailed at the time.

The first of the requirements for involuntariness specified by *McGucken, supra,* is that in submitting the resignation in dispute the employee was involuntarily acceding to terms laid down by his employer. Plaintiff's resignation does not fit that mold.

By no reasonable hypothesis can it be inferred that the court-martial proceeding was brought for the purpose of inducing plaintiff to resign. On the record, its single discernible object was the imposition of criminal sanctions. This course of action was initiated as an ex-

ception to the general policy in cases of alleged perversion directed to separation from the employment rolls, not as a measure in furtherance of that policy. Moreover, the evidence shows that once the Army authorities determined to proceed by court-martial their interest was the direct opposite of encouraging a resignation. They were trying their best to prevent acceptance of the one that had been submitted.

Although plaintiff averred at the pleading stage that his resignation and subsequent guilty plea were solicited from him as a package in return for clemency that did not materialize, there was no evidence adduced that even remotely suggested such an arrangement. The evidence of record points uniformly to the finding that the plaintiff's resignation was not affirmatively solicited by the Army by way of promise or inducement related to disposition of the charges against him or otherwise.

In sum, it is not reasonably possible to characterize plaintiff's resignation as the embodiment of his involuntary acceptance of terms dictated by his employer.

The second requirement announced by *McGucken* for the involuntariness of a resignation is that the attending circumstances offered the employee no reasonable alternative to resigning.

Here the relevant "circumstances" were the court-martial proceedings with which plaintiff was confronted. Thus, the controlling question is whether resignation is the likely, if not inevitable response of an employee faced with an unconstitutional court-martial trial.

Though there may well have been other motivating factors, such as the hope of securing leniency in sentencing, it is assumed for present purposes that plaintiff's predominant purpose in resigning was to defeat court-martial jurisdiction by severing his employment connection with the Army. His decision to resign was reached after consultation with his personal attorney who actually delivered the written resignation to the Army authorities on the eve of trial.

Albeit a matter of hindsight, it must be recognized that the resignation played no part in the Supreme Court's eventual finding of unconstitutionality. In fact, the Court's opinion describes plaintiff as an Army employee, not an ex-employee. Wilson v. Bohlander, *supra*, 361 U.S. 281, 283, 80 S.Ct. 305, 4 L.Ed.2d 282. Thus, the resignation proved to be completely extraneous to the question of court-martial jurisdiction.

More persuasive in the context of the predictability of a resignation flowing from the preferral of court-martial charges, is the fact that the irrelevance of the resignation to the jurisdictional issue was reasonably foreseeable at the time that the resignation was submitted.

By its terms, the resignation terminated plaintiff's employment at the close of business on August 20, 1956. At that point the court-martial process was well under way, charges having been served almost 2 months before and at a time when there was no question as to plaintiff's status as an Army employee. In its first Reid v. Covert opinion of June 11, 1956, the Supreme Court clearly indicated that court-martial jurisdiction was unaffected by a shift in the defendant's status occurring after the proceedings were under way. Specifically, the Court held that military jurisdiction, once attached, continues until final disposition of the case. Reid v. Covert, *supra*, 351 U.S. 487, 490, 492, 76 S.Ct. 880, 100 L. Ed. 135. That holding was based on traditional principles of jurisdiction and has never been modified.

Aside from plaintiff's attempt to defeat jurisdiction, the evidence suggests no other causal connection between the court-martial proceeding and his act of resigning. Treating the resignation as a legitimate but unavailing jurisdictional maneuvering device conceived with the benefit of counsel and appraising it in the light of the legal climate prevailing at the time, it cannot be reasonably concluded that within the meaning of *Mc-Gucken, supra*, the fact of the impending court-martial trial left plaintiff no alternative to resigning.

Following the 1-day court-martial trial, the conduct of plaintiff and the Army convincingly demonstrates that both parties regarded the resignation as being what its terms disclosed—an unqualified and final termination of plaintiff's Army employment.

For its part, the Army accepted the resignation as submitted. It did this even though its legal representatives in the court-martial proceeding strenuously argued against acceptance because of resulting prejudice to the Army's case. More important, by accepting the resignation the Army forwent its opportunity to remove plaintiff from the employment rolls under the administrative procedures established for that purpose. Finally, there is nothing in the record to suggest that in taking the resignation at face value and acting on it accordingly the Army was ignoring some indication that it was other than what it purported to be.

Upon denial of his motion to dismiss at the outset of the court-martial proceeding, plaintiff saw that his resignation was not going to defeat jurisdiction. Thus apprised, he gave no indication that he regarded his resignation as qualified or conditional.

On September 13, 1956, after his separation had been formally completed, plaintiff made application for a refund of his retirement contributions. On the form that he executed he specified that his Army service had terminated August 20, 1956. Pursuant to this application he was paid $2,828.10.

At no time during his confinement did plaintiff ever assert, in court or out, that his resignation was involuntary or otherwise tainted.

Plaintiff's first notice to the Army that he felt entitled to back pay and restoration to his former job was in the form of a letter, dated March 14, 1960, to the Comptroller for the Berlin Com-

mand. Insofar as pertinent, the letter stated:

> I hereby request that I be restored to my position as Auditor, G.S.–11, with all in-grade promotions, back pay, and all other benefits which I may be entitled to as a result of my illegal confinement in August 1956 which has been declared unconstitutional by the United States Supreme Court (361 U. S. 281, 80 S.Ct. 305, 4 L.Ed.2d 282).

Even at that point plaintiff did not assert that his resignation was defective or invalid. Rather, he asked for back pay as the measure of damages for confinement under an unconstitutional conviction. The availability of damage relief for unjust conviction is exclusively governed by the provisions of 28 U.S.C. § 2513 (1964 ed.). Confinement under an unconstitutional court-martial conviction is not compensable under that statute. Osborn v. United States, 322 F.2d 835 (5th Cir. 1963).

On May 18, 1960, the Berlin Command replied to plaintiff's letter and advised him that " * * * the Supreme Court Decision does not support your claim for restoration to your former position."

Not until plaintiff came to this court did he contend that he was due back pay because his resignation was involuntary and therefore void.

In summary, while the hope of defeating court-martial jurisdiction no doubt inspired plaintiff to resign at the particular time that he did, there is nothing in the record from which it can be reasonably inferred that he did not intend the resignation to be effective for all purposes and in all events. Moreover, it must be recognized that the resignation had the practical effect of preventing the Army from proceeding in 1956 with administrative removal. This court is not unmindful of such considerations when asked to invalidate a resignation. Johnson v. United States, 111 Ct.Cl. 750, 760, 79 F.Supp. 208, 213–214 (1948).

The remaining claim in suit is for money damages for defendant's alleged breach of its contractual agreement to provide plaintiff with medical care. Paragraph 8 of plaintiff's employment contract with the Army provided: "Necessary medical care and hospitalization will be provided by your employing command, while in the oversea area, pursuant to Army Regulations * * *." Until August 20, 1956, when he terminated his employment by resignation, this provision established and defined the Army's responsibility to plaintiff for medical care. In Booth v. United States, 140 Ct.Cl. 145, 155 F.Supp. 235 (1957), this court considered an essentially identical clause in the contract of a civilian employed overseas by the military and construed the Government's obligation as follows (at 150–51, 155 F.Supp. at 238):

> * * * To satisfy that contractual obligation, the United States, acting through the medical personnel of the United States military government in Germany, was obligated to meet the same standard of care as any other physician contracting to render medical service. That standard is usually stated to be such "reasonable and ordinary care, skill, and diligence as physicians and surgeons in good standing in the same neighborhood, in the same general line of practice, ordinarily have and exercise in like cases." * *
>
> While the Army medical personnel in Germany, in their medical care and treatment of Booth, had to exercise that degree of care and skill ordinarily exercised by the medical profession in similar cases, it did not have to exercise extraordinary skill and care or the highest degree of skill and care possible, and so long as the requisite skill and care were used, a mistake in diagnosis was not malpractice. * * *

The evidence shows that in March 1958, plaintiff had minimal active tuberculosis in the left lung. This was discovered in the course of a routine physical examination upon plaintiff's transfer from the Mannheim Stockade in Germany to the Army's New Cumberland Barracks confinement facility in Pennsylvania.

Plaintiff has no quarrel with the diagnosis and care that he received following initial detection of his tubercular condition at New Cumberland. He was promptly transferred to the Valley Forge Army Hospital to undergo further examination. The results of that examination, including positive sputum tests, confirmed the initial diagnosis. Plaintiff was thereupon removed to Fitzsimons Army Hospital, the Army's hospital specializing in tuberculosis, where he received care and treatment that arrested his tuberculosis before his release pursuant to the Supreme Court's mandate in the habeas corpus action.

■ It is contended that plaintiff had active tuberculosis in 1956 when confined at the Berlin Army Hospital awaiting trial and alleged that the Army breached its medical obligation to him by failing to detect the condition at that time and treat it accordingly.[3] The sole evidence in support of this proposition is the opinion testimony of two doctors given at the trial and based principally on their interpretation of Army medical records. At most, this testimony raises the possibility of an inaccurate diagnosis. Viewed on the evidence as a whole it clearly does not establish a breach of the liability standard for medical care announced in *Booth, supra.*

The clinical records show that on his admission to the Army hospital in June 1956, and during his 2-month stay there plaintiff underwent extensive medical examination and testing. Though chest X-rays suggested the possibility of pulmonary tuberculosis, which plaintiff had once had years before, follow-up tests, including the reliable sputum test, were all negative. Moreover, plaintiff's statements on interview did not disclose any of the usual symptoms of tuberculosis such as weight loss, unusual fatigue, night sweats or bronchial difficulty.

On August 27, 1956, plaintiff was released from the Berlin Army Hospital for confinement at the Mannheim Stockade with a diagnosis that showed no physical disability. A physical examination on arrival at the stockade showed plaintiff mentally and physically fit to perform hard labor.

The documentary evidence pertaining to the period of plaintiff's confinement at the Berlin hospital in 1956 fairly suggests that he had no active tuberculosis at that time. In any event, it demonstrates that the diagnostic procedures applied in his case were of sufficient thoroughness and efficacy to meet the standard of medical care that the Army owed him by contract. A difference of professional opinion in ultimate diagnostic conclusion, which is all that is present on this record, is not enough to fasten liability on the Government for substandard care. *Booth, supra.*

After August 20, 1956, the effective date of his resignation, plaintiff's status was that of a prisoner. The applicable Army regulations provide that prisoners are to receive the same medical services as those afforded military personnel generally. Basically, the procedure involves the traditional daily sick-call.

Plaintiff was confined at the Mannheim Stockade from September 1956 until March 1958. He received medical treatment there on only three occasions, all in February 1957, and in each instance for superficial complaints wholly unrelated to respiratory difficulty.

■ Since plaintiff was found to have moderately advanced pulmonary tuberculosis upon his transfer to the New Cumberland Barracks in 1958, it is clear that he developed active tuberculosis at some time during his confinement at the Mannheim Stockade. That fact alone, however, does not create Government liability because there is no evidence

---

**3.** To the extent that plaintiff also contends that at the same time he was suffering mental illness requiring treatment, his position is directly contradicted by both the results of the extensive psychiatric examinations conducted by his own specialist as well as the Army at the Berlin hospital, and by the evidence of his mental state during subsequent hospitalizations.

either that plaintiff was ever denied any medical treatment that he requested at Mannheim or that his sickness manifested itself in a manner that should reasonably have alerted the authorities there to his need for care and treatment of tuberculosis. Accordingly, we do not reach the jurisdictional problem of this court redressing any tortious malpractice shown on the merits to have occurred.

To the extent that the record sheds any light on the time at which the tubercular condition became active, the indication is that it was during the latter part of plaintiff's stay at Mannheim. Thus, in an interview on or about April 10, 1958, at Valley Forge Army Hospital, plaintiff advised the attending physician that he had "recently" noted that he was having night sweats—an indication of tuberculosis.

In sum, the evidence adduced simply does not show that the Army failed either (1) to meet the standard of medical care required of it while plaintiff was an employee, or (2) to provide him adequate medical attention as a prisoner.

Since plaintiff has not prevailed on either of his two claims, the petition must be dismissed.