John DONAGGIO, Plaintiff,

v.

**ARLINGTON COUNTY, VIRGINIA, et al., Defendants.**

Civ. A. No. 1:94CV1277.

United States District Court, E.D. Virginia, Alexandria Division.

March 28, 1995.

**450**

Michael T. Leibig, Carla Markim Siegel, Zwerdling, Paul, Leibig, Kahn, Thompson & Driesen, Fairfax, VA, for plaintiff.

Barbara S. Drake, County Atty., Ara L. Tramblian, Deputy County Atty., Arlington, VA, for defendants.

## MEMORANDUM OPINION

ELLIS, District Judge.

Does the First Amendment impose limits on partisan, government-sponsored speech so as to bar a county police chief from sending uniformed, armed, and publicly-paid police officers to appear at the nation's Capitol building to demonstrate in support of controversial proposed legislation? Does the First Amendment protect a police officer's right to refuse to participate in such a demonstration if he opposes the legislation? These intriguing questions of constitutional law, as well as several issues concerning municipal and individual liability under 42 U.S.C. § 1983, are presented by this action brought by a police officer, John Donaggio, against his county employer and its police chief.

Cross motions for summary judgment have been filed. The material facts are not in dispute. Although the Constitution protects Donaggio's right to refrain from speaking, he is not entitled to relief under § 1983 for three alternative reasons, namely that (i) as a matter of law, his participation in the demonstration was voluntary, (ii) had he been compelled to attend the demonstration in violation of his constitutional rights, the defendants named in this suit are not the parties liable for the violation, and (iii) in any event, qualified immunity bars recovery against the individual defendant. As a result, defendants' motion for summary judgment must be granted.

### I.[1]

John Donaggio has been an Arlington County police officer since April 1990. In early May 1994, the United States Congress was considering the addition of a highly controversial assault weapons ban to the Omnibus Crime Bill of 1994. This legislation was supported by the International Association of Chiefs of Police (IACP), a private professional organization of which Arlington County's Police Chief William Stover is a member. IACP officials asked Chief Stover for assistance in connection with mounting a public demonstration designed to encourage the House of Representatives to pass the assault weapons ban. Specifically, Stover was asked to send police officers for a media photo opportunity at the Capitol building. Stover personally supported the assault weapons ban, and was aware that the Arlington County Board of Supervisors had expressed its support for a similar weapons ban that was proposed in the Virginia General Assembly earlier in the year.[2] As a result, Stover agreed to IACP's request, and instructed his subordinates to find ten police officers who would volunteer to attend the demonstration as a special overtime detail at time and a half pay. Stover intended that participation in the detail be entirely voluntary. Yet, he admits that he took no steps to insure that

---

1. For purposes of a motion for summary judgment, the evidence must be construed, and inferences drawn, in favor of the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970). Cross motions for summary judgment are presented here. There are no disputed, material issues of historical fact, although the parties of course disagree about the relevant law and the proper application of that law to the facts.

2. The Board's 1994 legislative agenda included support for the Northern Virginia Planning Dis-

trict Commission's 1994 Legislative Program position on firearms. This entailed support for "a ban on the sale, distribution, or possession of assault weapons."

Donaggio notes that Arlington County did no traditional lobbying in support of the federal Omnibus Crime Bill. Other than routine tracking of legislation and the police demonstration at the Capitol, the County took no action with respect to the bill.

subordinates properly carried out his instructions.[3]

On May 1 and 2, patrol supervisors announced at roll call that the overtime detail was available and would take place on May 5. The supervisors stated only that the detail was for a photo opportunity in Washington, D.C. and that other police departments would be involved. Ten officers, including Donaggio, volunteered for the special detail. They were told to assemble at the police station at 11:00 a.m. on Thursday, May 5, in dress uniform.

Over the next two days, Donaggio and several other officers inquired further and were told more about the detail. There was initially some confusion about the detail's purpose, and several supervisors mistakenly told officers that the detail was in honor of the National Police Memorial, or that it was to "kick off" National Police Week. Although police supervisors knew that the officers who volunteered for the detail were unaware of its nature, they took no steps to ensure that the officers were accurately informed. Eventually, however, Donaggio and other officers learned that the detail was for a photo opportunity showing police officers in support of the assault weapons legislation. On learning this, some were disinclined to participate. Donaggio and several other officers told their supervisors that they opposed the bill and did not wish to attend the demonstration. One officer who initially had volunteered, Andrew Hayes, was excused by a supervisor after expressing his opposition to the detail. But Donaggio and other officers were told that they were required to attend unless they could find a replacement who was not already assigned to be on duty that day and who would appear in uniform at the appointed place and time.

■ Specifically, on the morning of May 5, Donaggio spoke with Corporal Ed Chapman and then Lieutenant John Blake about the detail. They told him if he failed to attend, he might be subject to discipline in the form of a "yellow letter" of corrective action placed permanently in his file and the loss of four hours of his accumulated leave. Lieutenant Blake acknowledged that any disciplinary action he recommended would have to be approved by higher officials including the police chief.[4] Contemporaneous with his conversations with Corporal Chapman and Lieutenant Blake, Donaggio also spoke to the president of the local chapter of the police union, and to the union's counsel.[5] Each told Donaggio that disciplinary action against him would violate Arlington County's "Little Hatch Act," a county ordinance concerning the political activities of county employees.[6] The union's attorney further advised Donaggio that there would be less publicity and confrontation if he agreed to go, but that if he

---

**3.** Although irrelevant to the issues at bar, Chief Stover, by affidavit, stated that after the May 5 demonstration, he admonished a subordinate for failing to carry out his instructions to limit the detail to volunteers.

**4.** Donaggio stated in deposition that Lieutenant Blake simply described the available options and their consequences:

> It was—it was basically an ultimatum. If you do this, this will happen. If you do this, this will happen; meaning if you don't do this, this will happen. And that was just factual. You known, John, this is what's going to happen. Do you understand? Yes, I do. And then it was just a hang up. There was nothing, I will call you back or good-bye; just a very, you know, terse conversation. And at that point I don't think either one of us knew who was going—if I was going to be there or not.

**5.** Donaggio waived whatever privilege, if any, applied to his telephone conversation with the

union's attorney by testifying about it in deposition. At his deposition, Donaggio was represented by counsel, and no objection was made to the questions or testimony on the ground of attorney-client privilege. *See* Rule 501, Fed.R.Evid. (federal common law governs privilege issues in cases arising under federal law); *In re Martin Marietta Corp.*, 856 F.2d 619, 622–23 (4th Cir. 1988) (client waives attorney-client privilege by disclosing confidential communications), *cert. denied*, 490 U.S. 1011, 109 S.Ct. 1655, 104 L.Ed.2d 169 (1989). For cases recognizing that a client's deposition testimony may waive the privilege, see *Weil v. Investment/Indicators, Research & Management, Inc.*, 647 F.2d 18, 24–25 (9th Cir.1981); *Thomas v. F.F. Fin., Inc.*, 128 F.R.D. 192, 193 (S.D.N.Y.1989); *Panter v. Marshall Field & Co.*, 80 F.R.D. 718, 722 (N.D.Ill.1978); *Perrignon v. Bergen Brunswig Corp.*, 77 F.R.D. 455, 459 (N.D.Cal.1978); *Goldman, Sachs & Co. v. Blondis*, 412 F.Supp. 286, 287–88 (N.D.Ill.1976).

**6.** Arlington County Code, ch. 6, §§ 23–24. The federal Hatch Act is found at 5 U.S.C. § 7324.

refused to do so, any punishment he received would definitely be rescinded.[7] There was also some discussion between Donaggio and the union's attorney about the possibility of recovering an award of compensatory damages.[8]

Donaggio arrived at the station on the morning of May 5, in uniform, as directed. From there, he and nine fellow officers proceeded to the U.S. Capitol where they were met by an IACP representative. The officers were instructed not to speak to anyone else or to express opposition to the bill. No other police officers or departments were present at the photo opportunity. The ten Arlington County officers were arranged in a line ascending the steps of the Capitol. As then Treasury Secretary Lloyd Bentsen entered the building to lobby for the assault weapons bill, he shook hands with and spoke briefly to each officer. Photos and film of Bentsen and the Arlington County officers subsequently appeared on the CBS evening news, and in various newspapers, including *USA Today*. The proposed assault weapons provision passed in the House by a margin of two votes, and eventually became law in September 1994.[9]

Controversy concerning the demonstration continued within the Arlington County police department even after the event. A copy of the *USA Today* photo was anonymously posted on a bulletin board in the department's roll call room, along with a copy of Arlington County's "Little Hatch Act." In addition, a police lieutenant discussed the matter at roll call on May 9, and inaccurately stated that a supervisor accompanied the officers to the Capitol, that other police departments participated in the demonstration, and that no one was threatened with a loss of leave if he or she did not attend.

■ On August 10, 1994, a taxpayer filed a civil complaint in Arlington Circuit Court challenging the payment of overtime wages to the police who attended the demonstration on non-constitutional grounds as an unlawful expenditure of county funds. The suit, styled *Blackman v. Stover, et al.*, was brought against Chief Stover and the ten officers. It sought a decree requiring the officers to reimburse the County for the overtime compensation they received. The County Attorney filed a demurrer on behalf of Chief Stover on the ground that he acted within his authority in approving the use of county funds for the special detail. Donaggio appeared by separate counsel and argued against the demurrer and in favor of the taxpayer's position. The Arlington Circuit Court granted Chief Stover's demurrer, finding that his actions were within his authority under state law.[10] Given this ruling, the taxpayer plaintiff conceded that his claims

---

7. Donaggio testified in deposition, in relevant part, that:

 > [The union's attorney, Michael Liebig,] said, yes, it's definitely a violation of the little Hatch Act, the County's own political guidelines.
 >
 > You can do one of two things. You can go or not go. If you go—or if you don't go, you'll be an NRA poster child, you'll become a figure head for the NRA. There will be a lot of things surrounding you and your objections to not going; that he would definitely be able to re-award—not—put back the four hour. He believed with certainty that he would be able to have the letter of—to have the punishment rescinded.
 >
 > And—and then if I—if I did go that what we could do is file a grievance through—through the union or—or—this way it would be less publicity. It wouldn't be as confrontational with myself and management.
 >
 > I chose that avenue, because I didn't want the possibility, even though he said with certainty that he felt that he could have these things rescinded—there's always that possibility of not having it. I didn't want that reputa-

 tion of being insubordinate and challenging a lieutenant's, you know, directions. And that's why I went.

8. Donaggio stated in deposition that they discussed the possible recovery of compensatory damages in the event that he refused to attend the demonstration and was punished. He did not recall whether they discussed the possibility of recovering damages if he attended.

9. *See* Violent Crime Control & Law Enforcement Act of 1994, Pub.L. No. 103–322, § 110102, 108 Stat. 1796 (Sept. 13, 1994) (codified at 18 U.S.C. §§ 921(a)(30), 922(v), 923(d), 924(c)).

10. The Arlington Circuit Court initially granted a demurrer to Chief Stover and allowed Blackman leave to file an amended bill of complaint. *Blackman v. Stover*, Chancery No. 94–659 (order of Sept. 20, 1994). After an amended complaint was filed, the County Attorney again sought a demurrer on behalf of Chief Stover, which the Circuit Court granted. *Id.* (order of Oct. 24, 1994).

against the police officers could not succeed, and therefore the Circuit Court also dismissed the action as to the police officers.[11] The taxpayer has filed a petition for appeal to the Supreme Court of Virginia, which petition is currently pending before that court.[12]

 In September 1994, Donaggio commenced this action against Arlington County and against Chief Stover, in his official and his individual capacities.[13] He asserts four claims:

(i) a § 1983 claim for violation of his First Amendment rights,

(ii) a § 1983 claim for violation of his Fourteenth Amendment right against having his liberty restricted or his name, likeness, and reputation appropriated without due process of law,

(iii) a claim of common-law defamation, harm to reputation, and invasion of privacy, and

(iv) a claim for violation of Arlington County's "Little Hatch Act." [14]

Donaggio seeks a declaratory judgment, permanent injunctive relief, compensatory and punitive damages, and his attorneys' costs and fees.

## II.

 Donaggio moves only for partial summary judgment, seeking a ruling that defendants are liable on Counts 1 and 2, the § 1983 claims.[15] In seeking summary judgment, Donaggio does not rely on his allegation that he was forced to attend the demonstration. Rather, he contends that his First and Fourteenth Amendment rights were violated by defendants *even if* his participation was not compelled. He argues that the Constitution does not permit a local police chief, at the behest of a private interest group such as the IACP, to send uniformed, armed, publicly-paid police officers to demonstrate in favor of controversial legislation, even if the officers involved are fully-informed volunteers. Speech that is orchestrated and subsidized by the government in this manner, so the argument goes, violates the Constitution because it is "too loud," that is, it too easily overshadows, "drowns out," or reduces the significance or effectiveness of private speech.[16] Although this argument relies

11. For unstated reasons, the Circuit Court's order did not dismiss the action against Donaggio. On November 10, 1994, Blackman took a voluntary nonsuit as to Donaggio.

12. Contrary to the assertions of Arlington County and Chief Stover, the *Blackman* litigation has no preclusive effect on the case at bar. Blackman's claims were based on state and local law rather than the Constitution. Further, the Arlington Circuit Court's final order expressly stated that "this action does not concern the voluntariness of acts by participants or their rights in the employment relationship." Blackman's pleading stated that the demonstration was voluntary, and for purposes of the demurrer, was taken by the Circuit Court to be true. *See Fun v. Virginia Military Inst.*, 245 Va. 249, 427 S.E.2d 181, 183 (1993) (demurrer merely tests factual allegations to determine whether they state a cause of action). Thus, whether Donaggio's constitutional rights were violated was neither actually nor necessarily decided in the state court proceeding. *See Snyder v. City of Alexandria*, 870 F.Supp. 672, 689–90 (E.D.Va.1994) (discussing Virginia law on issue preclusion).

13. Individuals may be sued under § 1983 in their official and individual capacities. The official capacity suit is treated "in all respects other than name" as a suit against the entity that the official represents. *Kentucky v. Graham*, 473 U.S. 159,

166, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985). Thus, Donaggio's claims against Chief Stover in his official capacity are treated identically to his claims against Arlington County.

14. Section 23(b) of Chapter 6 of the Arlington County Code prohibits county officials from rewarding or discriminating against a county employee based on his or her political activities or affiliations. Section 23(h)(2) prohibits county employees from engaging in political activities (i) while in uniform or in a manner that identifies the person as a county employee, (ii) while on duty, or (iii) while on county property.

15. Summary judgment, of course, is appropriate only if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

16. Donaggio also claims that the demonstration falsely suggested that there was "near universal" support for the assault weapons ban among police. This argument is clearly without merit, for a reasonable observer could not possibly conclude that a majority of the nation's police officers supported the bill from the fact that ten Arlington County police officers appeared at the Capitol. Moreover, even assuming the demon-

solely on undisputed facts, it nevertheless fails because the Constitution does not forbid the practice of which Donaggio complains.

Donaggio's argument finds no support in the Constitution's text. The First Amendment proscribes laws "abridging the freedom of speech." U.S. Const. amend. I. Assuming, *arguendo*, that Arlington County solicited and paid ten of its police officers to appear at the demonstration on a voluntary basis, no one's freedom to speak or to refrain from speaking was thereby abridged in any ordinary or conventional sense. The County expressed its view of the bill, the police officers chose to assist that expression, and anyone who wished to stage a counter-demonstration or to speak in opposition to the assault weapons ban was free to do so.[17] All parties retained their right to decide whether, when, and how to speak. That some speech may be "louder" or more effective than others does not mean that the "louder" speech abridges the others.

Donaggio's view, if accepted, would result in the odd conclusion that the First Amendment operates to restrict speech. He contends that the County should have been prevented from expressing its support for the

assault weapons ban in the manner it chose. In short, he argues that the First Amendment should be construed to *impose* a limitation on the County's speech. Yet, by its text, the First Amendment operates only to *preclude* limitations on speech.[18]

By contrast, the First Amendment's provisions on religion both protect the free exercise of religion and forbid the establishment of religion by government. U.S. Const. amend. I. As a result, the amendment's religious provisions do not merely preclude government interference with private religious activities; they also impose important limitations on governmental actions relating to religion. For example, government sanctioning of organized prayer in public schools, even if "voluntary," is unconstitutional. *See, e.g., Wallace v. Jaffree*, 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985). Donaggio's argument is essentially that the First Amendment should contain an "establishment clause" with respect to speech. Whatever one may conclude about the merits of such a clause, the short answer is that the First Amendment contains no such "speech establishment" clause.[19]

---

stration had effectively conveyed the message that many police supported the weapons ban, no constitutional violation would have occurred, for protected speech cannot become unconstitutional merely because it is persuasive or effective.

**17.** Donaggio contends that Arlington County's "Little Hatch Act" prevented police officers who opposed the assault weapons ban from appearing in uniform to demonstrate against the legislation. *See supra* note 14. If true, this fact supports an argument that the "Little Hatch Act" is an unconstitutional restriction on police officers' speech, but it does not support the conclusion that the First Amendment must narrowly restrict the County's speech in the same way that the "Little Hatch Act" restricts its employees' speech. *See Broadrick v. Oklahoma*, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973) (upholding the constitutionality of state-law "little Hatch Act").

**18.** Donaggio's view that the First Amendment limits government advocacy has been rejected by another district court in this circuit.

More fundamentally, the notion that it is unconstitutional and somehow violative of the rights of individual members of society for a government to advocate a particular position is erroneous.... What is condemned by the free

speech guarantee of the First Amendment is not advocacy by the government, but rather conduct which limits similar rights guaranteed to individual members of society.

*Arrington v. Taylor*, 380 F.Supp. 1348, 1364 (M.D.N.C.1974) (rejecting challenge to subsidization of university student newspaper).

**19.** Judge Butzner long ago recognized this distinction between the speech and religion provisions of the First Amendment in *Joyner v. Whiting*, 477 F.2d 456 (4th Cir.1973). There, the district court held that the Fourteenth Amendment and the Civil Rights of Act of 1964 required a state university to cut off funding to a student newspaper which published editorials supporting racial segregation. Reversing that decision, Judge Butzner explained that:

The [district] court's rationale disregards the distinction between the First Amendment's clause prohibiting the establishment of religion and its clause protecting freedom of the press. Neither federal nor state governments may expend funds to establish a religion. The First Amendment, however, contains no similar ban against speech or press. Both governments may spend money to publish the positions they take on controversial subjects.

*Id.* at 461.

Donaggio cites no judicial precedent in which the First Amendment has been interpreted as he proposes.[20] Instead, he cites several commentators who have discussed the possibility that free speech principles might require restriction of partisan, government-sponsored speech. For example, one such authority has postulated that:

> [i]n theory the government's use of expression to curb private expression would clearly constitute a violation of the First Amendment. The government is surely under a constitutional obligation not to use its power of expression, any more than other power, to abridge freedom of expression. Moreover, there is no real paradox involved in invoking the First Amendment to restrict government expression.

Emerson, *The System of Freedom of Expression* 700 (1970).[21] However eloquent this passage may be, it does not attempt to be, and plainly is not, a statement of existing First Amendment law.

Donaggio comes closest to citing relevant judicial precedents when he points to cases dealing with political patronage and government jobs. *See Rutan v. Republican Party of Ill.*, 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990); *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). The Supreme Court has held that the use of political considerations in hiring, firing, and promoting government employees must be narrowly tailored to serve vital government interests.

*See Rutan*, 497 U.S. at 74, 110 S.Ct. at 2736–37. It is quite easy to see how the free speech of government employees (or potential employees) is likely to be abridged if employment decisions are based on the employees' political views. For example, pro-choice expression is likely to be chilled if pro-life workers receive favored treatment, or vice versa. By contrast, inequality of overtime or other employment opportunities is not the gist of Donaggio's complaint. He does not claim that overtime details were exclusively or disproportionately available to police officers who supported the assault weapons ban, or to officers of any particular political bent.[22] Rather, Donaggio's complaint is that, however equally the police department treated its officers, government resources and the imprimatur of County authority were used impermissibly to endorse one point of view in the gun control debate. In sum, the linchpin of *Rutan* and related cases, namely a danger of abridgement of the free speech of government employees, is missing from the case at bar, absent proof that the police officers' participation in the demonstration was involuntary.

■ Donaggio's argument, if accepted, might well halt or imperil efforts by cities and counties to take partisan positions on pending legislation. Such a far-reaching and dramatic result would significantly alter the existing political landscape. Cities and counties lobby every day in this country on a variety of issues, and in various ways.[23]

---

**20.** Donaggio argues at one point that *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943), supports his position, but he misconstrues the case as holding that the voluntary recitation of the pledge of allegiance by school children is unconstitutional. In fact, the *Barnette* Court merely held that the First Amendment prevents school children who decline to salute the flag from being forced to do so, and of course did not suggest that voluntary flag salutes are forbidden.

**21.** *See also* Zeigler, *Government Speech and the Constitution: The Limits of Official Partisanship*, 21 *B.C.L.Rev.* 578, 619 (1980) (predicting that "the constitutionality of government speech in the form of official partisanship may well prove to be an issue in the years ahead which will have a significant bearing on our constitutional order").

**22.** In any event, Donaggio would not have standing to raise such an argument, because he participated in the detail and was paid for his time, and therefore was not excluded from getting overtime because of his political beliefs. *See, e.g., Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 471–76, 102 S.Ct. 752, 757–61, 70 L.Ed.2d 700 (1982) (discussing "distinct and palpable injury" requirement of standing doctrine).

**23.** In fact, Congress recognized that government officials engage in lobbying and expressly exempted them from the lobbyist registration requirements of 2 U.S.C. § 267. *See Bradley v. Saxbe*, 388 F.Supp. 53 (D.D.C.1974) (interpreting exclusion for public officials to include organizations lobbying on behalf of member cities, counties, and mayors).

Lobbying is an activity at the core of the First Amendment, involving the rights to "freedom of speech" and to "petition the Government for a redress of grievances." *See California Motor Transp. Co. v. Trucking Unlimited,* 404 U.S. 508, 510–11, 92 S.Ct. 609, 611–12, 30 L.Ed.2d 642 (1972); *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 137, 81 S.Ct. 523, 529, 5 L.Ed.2d 464 (1961). Because cities and counties are agencies of states, the First Amendment may not protect their right to speak,[24] but neither does the amendment prohibit their speech. *Muir v. Alabama Educ. Television Comm'n,* 688 F.2d 1033, 1041 (5th Cir.1982), *cert. denied,* 460 U.S. 1023, 103 S.Ct. 1274, 75 L.Ed.2d 495 (1983); *Joyner v. Whiting,* 477 F.2d 456, 461 (4th Cir.1973); *Arrington v. Taylor,* 380 F.Supp. 1348, 1365 (M.D.N.C.1974). Moreover, there are sensible policy reasons for not adopting a ban on government lobbying,[25] for the Supreme Court has implied that government lobbying is even more valuable than private lobbying. In *United States v. Harriss,* 347 U.S. 612, 74 S.Ct. 808, 98 L.Ed. 989 (1954), the Court explained the lobbyist registration requirements of the Federal Regulation of Lobbying Act,[26] as reflecting the danger that "the voice of the people may all too easily be drowned out by the voice of special interest groups seeking favored treatment while masquerading as proponents of the public weal." *Id.* at 625, 74 S.Ct. at 816.[27] Government lobbying is clearly not a disfavored form of expression under the First Amendment.

▪ Assuming once again that the police officers' participation was voluntary, Donaggio does not persuasively distinguish the demonstration at the Capitol from the myriad daily instances of lobbying by governmental units that are unquestionably constitutional. Donaggio suggests that the distinguishing characteristic of this demonstration was that the participants were armed, uniformed police officers.[28] It is true that police departments play a unique role as "paramilitary organizations," a fact that weighs in First Amendment analysis. *See Jurgensen v. Fairfax County,* 745 F.2d 868, 880 (4th Cir.1984) (police officers are at bottom of spectrum of First Amendment protection). Yet, the distinctive nature of police officers' work cannot justify applying a rule to them that is radically different from that applied to other government officials. The First Amendment generally allows cities and counties to lobby through their chosen representatives, and cannot be interpreted to forbid such lobbying when police officers are used.

This is not to say that Donaggio's criticism of the police department's involvement in the demonstration is necessarily unfounded. The only question presented here is whether Donaggio's constitutional rights were violated. It is therefore unnecessary to consider

---

**24.** *Compare Muir v. Alabama Educ. Television Comm'n,* 688 F.2d 1033, 1041 (5th Cir.1982) (state instrumentalities are without First Amendment protection), *cert. denied,* 460 U.S. 1023, 103 S.Ct. 1274, 75 L.Ed.2d 495 (1983), *with County of Suffolk v. Long Island Lighting Co.,* 710 F.Supp. 1387, 1390 (E.D.N.Y.1989) (municipal corporation, like any corporation, is protected by First Amendment). *Cf. Serra v. United States Gen. Servs. Admin.,* 847 F.2d 1045, 1048–49 (2d Cir.1988) (federal government has greater latitude in advancing or restricting its own speech than in regulating speech of individuals).

**25.** Of course, it is not difficult to see a distinction on policy grounds, as opposed to constitutional grounds, among various forms of government lobbying. For example, a simple, straightforward statement or press release expressing the County's support for the ban and its reasons for its support may be viewed as preferable on policy grounds to the largely theatrical use of uniformed police officers. The latter method, unlike the former, is emotionally affective, expensive,

and communicates little about the merits of the issue. Moreover, unlike other forms of lobbying, use of police officers runs a risk of involving those who disagree with the message presented.

**26.** 2 U.S.C. §§ 261–270.

**27.** *But see National Ass'n of Social Workers v. Harwood,* 860 F.Supp. 943 (D.R.I.1994) (striking down state legislature's rule under First Amendment because it favored government lobbyists over private ones).

**28.** Donaggio also emphasizes (i) that the officers were paid overtime wages for time spent on the detail, and (ii) that intense controversy surrounded the assault weapons ban. These factors do not distinguish the demonstration from other forms of lobbying commonly undertaken by counties and cities. Most lobbying is done by paid officials and involves controversial issues. In fact, there is little point in lobbying on an issue about which there is no controversy.

whether, as a matter of policy, a county should be forbidden from paying its police officers to appear at political demonstrations. Sensible arguments against such demonstrations come readily to mind. One might conclude that prohibiting counties from paying police officers to engage in expressive activities would result in a more balanced and constructive public debate on controversial issues. For example, Congress has enacted federal election campaign finance legislation that restricts the expression of some speakers, such as corporations or individuals with substantial wealth to spend on political contributions and advertising. *See* 2 U.S.C. §§ 431–455. Closer to the situation at bar, Congress has enacted laws, such as the Hatch Act in 1939, that limit the political expression and activities of government employees. *See, e.g.,* 5 U.S.C. § 7324 (employees of executive agencies may not use official authority to affect election or take active part in political management or campaign). No one suggested that the First Amendment *mandated* these laws; it clearly does not. Rather, the difficult question for the Supreme Court was whether the First Amendment *tolerated* them.[29] In essence, Donaggio seeks to constitutionalize one of the principles reflected in the Hatch Act. This effort asks the First Amendment to carry more weight than it can bear. While Congress has enacted statutes that restrict the expression of some speakers in an attempt to promote vigorous and diverse expression by other speakers, the First Amendment has never been interpreted to, and plainly does not, mandate such rules.

■■■ Donaggio's motion for summary judgment on his § 1983 claim based on the Fourteenth Amendment fares no better than that based on the First Amendment. Again, in seeking summary judgment, Donaggio does not rely on his contention that he was compelled to participate in the demonstration. Given this, the Due Process Clause cannot support his claim. Where one voluntarily surrenders a liberty or property interest, there is no deprivation of that interest to constitute a due process violation. *See Weller v. Department of Social Servs. for Baltimore,* 901 F.2d 387, 393 (4th Cir.1990); *Stone v. University of Md. Medical Sys. Corp.,* 855 F.2d 167, 172–73 (4th Cir.1988). As a result, if Donaggio was not compelled to participate in the demonstration at the Capitol, then he plainly was not deprived of a "life, liberty, or property" interest secured to him by the Fourteenth Amendment.

In sum, the fact that Chief Stover sent uniformed, armed, and publicly-paid police officers to help support passage of the assault weapons ban, though indisputably true, does not entitle Donaggio to recover. It was not unconstitutional for the County, through Chief Stover, to organize and pay its police officers to demonstrate in favor of the bill if the officers voluntarily and knowingly agreed to do so. As a result, Donaggio's motion for summary judgment must be denied.

## III.

■■■ Donaggio stands on a different and significantly stronger footing in arguing that his constitutional rights were violated if, as he contends, he was forced to participate in the demonstration at the Capitol. He persuasively argues that the First Amendment is violated when police officers are compelled to participate in an expressive activity, such as the demonstration against the assault weapons ban, even though they oppose the message being presented. Freedom of speech includes the right to refrain from speaking.[30] It is plain that Donaggio and the

---

**29.** *See Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (considering constitutionality of Federal Election Campaign Act provisions); *United States Civil Servs. Comm'n v. National Ass'n of Letter Carriers,* 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973) (considering constitutionality of Hatch Act provisions); *United Pub. Workers v. Mitchell,* 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947) (same).

**30.** *See Lehnert v. Ferris Faculty Ass'n,* 500 U.S. 507, 111 S.Ct. 1950, 114 L.Ed.2d 572 (1991)

(union members cannot be compelled to pay union dues used for political lobbying); *Abood v. Detroit Bd. of Educ.,* 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977) (same); *Wooley v. Maynard,* 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977) (motorist cannot be compelled to display state motto "Live Free or Die" on license plate); *Miami Herald Pub. Co. v. Tornillo,* 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974) (newspaper cannot be compelled to print response of political candidate attacked in editori-

other police officers who appeared at the photo opportunity on the Capitol steps were engaged in an expressive activity within the First Amendment's protections. Although the officers were not required to say anything, to hold a banner or sign, or otherwise to express overtly their personal views about the assault weapons ban, their presence at the Capitol was carefully and purposefully designed to send a message about the legislation. As the event's organizers intended, the police officers were perceived by the press, and presumably by Congress and the public, to be "[o]ut in force against assault weapons." *House OKs Weapons Ban, Charlotte Observer,* May 6, 1994, at 1A (photograph caption).

▆▆▆▆ There has been no showing of reasons why it was necessary to compel Donaggio to participate in the demonstration. Government employees do not forfeit their free speech rights on accepting public employment. *Pickering v. Board of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1963). Yet, a governmental entity has a greater interest in regulating the speech of its employees than in regulating the speech of citizens in general. This is particularly true with respect to police officers, of whom exceptional "discipline, *esprit de corps,* and uniformity" is required. *Kannisto v. City & County of San Francisco,* 541 F.2d 841, 843 (9th Cir.1976), *cert. denied,* 430 U.S. 931, 97 S.Ct. 1552, 51 L.Ed.2d 775 (1977); *Jurgensen v. Fairfax County,* 745 F.2d 868, 880 (4th Cir.1984). As a result, in deciding free speech claims of public employees, courts must balance the government's interests against those of the employee. *Rankin v. McPherson,* 483 U.S. 378, 384, 388–89, 107 S.Ct. 2891, 2896–97, 2899–2900, 97 L.Ed.2d 315 (1987); *Connick v. Myers,*

461 U.S. 138, 142, 150–51, 103 S.Ct. 1684, 1687, 1691–1692, 75 L.Ed.2d 708 (1983); *Pickering,* 391 U.S. at 568, 88 S.Ct. at 1734–35.[31] In this case, it is undeniable that defendants have a strong interest in efficiently providing police services to the community. Yet, they have not attempted to, nor could they persuasively, justify compelling Donaggio to assist in the demonstration at the Capitol on the ground that it was necessary to the police department's effective functioning. Thus, under established First Amendment principles, Donaggio's right to refrain from speaking was violated if he was forced to join the demonstration.

▆▆▆▆ Even if Donaggio was forced to attend the demonstration, his § 1983 claim based on the Due Process Clause adds nothing to his claim based on the First Amendment. Donaggio argues that he was deprived of a liberty interest, namely his right to refrain from speaking. Likewise, he argues that he was deprived of a property interest when his likeness was used to publicize a political message which he opposed.[32] These are merely restatements of Donaggio's First Amendment claim. In essence, this due process claim does no more than reflect the familiar proposition that the Fourteenth Amendment's breadth "incorporates" the protections of the First Amendment. *See, e.g., New York Times Co. v. Sullivan,* 376 U.S. 254, 276–77, 84 S.Ct. 710, 724, 11 L.Ed.2d 686 (1964).

Thus, Donaggio's First and Fourteenth Amendment rights were violated if his supervisors compelled him to appear at the photo opportunity. But analysis cannot end there. The question remains whether he was in fact compelled to appear against his wishes, and if so, whether the defendants sued in this action are liable to him under § 1983. For

als); *West Virginia State Bd. of Educ. v. Barnette,* 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943) (school children cannot be compelled to salute flag); *see also* Gaebler, *First Amendment Protection Against Government Compelled Expression and Association,* 23 B.C.L.Rev. 995 (1982).

**31.** The First Amendment has been interpreted to protect a public employee from adverse employment action only if the speech in question involved "a matter of public concern." *Rankin,* 483 U.S. at 384–87, 107 S.Ct. at 2896–99. The

enactment of an assault weapons ban was plainly a matter of vital public concern.

**32.** Donaggio also claims that he was deprived of a property interest in his name and reputation. There is no evidence that Donaggio's name was in fact appropriated. Further, a person's reputation, standing alone, is not a "property" interest within the meaning of the Due Process Clause. *Paul v. Davis,* 424 U.S. 693, 710–11, 96 S.Ct. 1155, 1164–65, 47 L.Ed.2d 405 (1976).

three alternative reasons, relief is not available to Donaggio under § 1983.

### A.

Donaggio cannot recover under § 1983 because he was not forced to attend the demonstration. Determining whether Donaggio's participation was voluntary or involuntary requires an application of law to facts. Although the parties disagree about the ultimate legal conclusion, there is no dispute about the underlying, historical facts. And where, as here, the only issue to be decided is the legal consequence of undisputed facts, summary judgment is appropriate. *Power Distribution, Inc. v. Emergency Power Eng'g, Inc.*, 569 F.Supp. 54, 57 (E.D.Va. 1983); *see Stone v. University of Md. Medical Sys. Corp.*, 855 F.2d 167, 172–73 (4th Cir.1988) (affirming summary judgment for defendants where undisputed facts showed, as matter of law, that plaintiff voluntarily resigned employment).

The parties agree that Donaggio initially volunteered for the overtime detail, but did not learn of its true purpose until shortly before it was scheduled to begin. He then told his supervisors that he opposed the legislation, and that he did not wish to participate in a demonstration supporting it. In response, he was told that he would be excused from the detail if he found a replacement who would appear in proper uniform on time and who was not already assigned to be on duty that day.[33] On the morning of the detail, he told one supervisor, Corporal Chapman, that he was not going to appear. He was told what sanctions he might face if he did so. A second supervisor, Lieutenant Blake, reiterated Donaggio's options and their consequences.[34] Specifically, Lieuten-

ant Blake indicated that he would recommend disciplinary action and docking of Donaggio's accumulated leave if Donaggio refused to attend and did not find a replacement. Shortly thereafter, Donaggio was assured by his labor union's counsel that any punishment imposed upon him for refusing to attend would be rescinded. He ultimately decided to attend the demonstration because he feared the possibility that the punishment would not be rescinded as the union's attorney predicted, and because he did not want the reputation within the department of being insubordinate.[35]

Under these circumstances, well-established law compels the conclusion that Donaggio voluntarily attended the demonstration. Thus, a unanimous Fourth Circuit panel addressed an analogous question, namely whether or not an employee's resignation is voluntary, in *Stone v. University of Md. Medical Sys. Corp.*, 855 F.2d 167, 173–78 (4th Cir.1988).[36] *Stone* recognized two theories under which a resignation might be deemed involuntary, terming these the "misrepresentation" and "duress/coercion" theories. *Id.* at 174. Under the former theory, Donaggio's decision to appear at the Capitol was involuntary if it was "induced by [his] reasonable reliance upon [his] employer's misrepresentation of a material fact" concerning the demonstration. *Id.* This theory is inapplicable here, because the initial confusion about, and misrepresentation of, the overtime detail's purpose was corrected before Donaggio finally elected whether to go. By the morning of the demonstration, he admittedly knew that the detail involved a media photo opportunity in support of the

---

**33.** There is no evidence in the record indicating whether it was possible for Donaggio to find a substitute to go in his place. For the purposes of defendants' motion, it will be assumed, in Donaggio's favor, that it was impossible for him to find a replacement.

**34.** *See supra* note 4.

**35.** *See supra* note 7. Although Donaggio and the police union's attorney had a telephone conversation concerning the possibility of recovering compensatory damages, there is insufficient evidence to support defendants' suggestion that Do-

naggio's decision to attend the demonstration was motivated in part by considerations of how best to position himself to recover damages. *See supra* note 8. This allegation, therefore, plays no role in the summary disposition of the case.

**36.** While *Stone* was concerned only with whether the plaintiff was deprived of liberty and property interests under the Fourteenth Amendment, its logic and analysis are equally applicable to a claim of compelled speech under the First Amendment.

assault weapons ban.[37]

█ Under the "duress/coercion" theory, Donaggio's participation was involuntary if "on the totality of circumstances," the threat of disciplinary action "effectively deprived [him] of free choice in the matter." *Stone*, 855 F.2d at 174. Factors to be considered are (1) whether Donaggio had some alternative to attending, (2) whether he understood the nature of his choice, and (3) whether he was given a reasonable time in which to choose.[38] *Id.* Assuming, *arguendo*, that it was impossible for him to find a replacement to go in his stead, Donaggio's alternatives were simple, namely to attend the demonstration or to refuse to do so. In determining whether the latter was a real alternative open to him, the assessment "must be gauged by an objective standard." *Id.* Thus, it is irrelevant that he may have perceived himself to be unable to refuse an order to participate, "for example, because of concerns about his reputation." *Id.*

█ The undisputed facts disclose that Donaggio was not deprived of his power to make a "free choice" whether to participate in the detail at the Capitol. Although he was under some time pressure, it is clear from the record that Donaggio recognized the choice available to him and understood the consequences of his choices. Most importantly, he was assured by his union's counsel that any punishment imposed upon him would be rescinded. Faced with this quandary, Donaggio elected to attend the detail. In his own words, he "chose that avenue." *See supra* note 7. The fact that Donaggio faced a choice between "comparably unpleasant alternatives"—attending the detail or facing disciplinary charges—does not by itself

render his decision an involuntary one. *Id.; Christie v. United States*, 518 F.2d 584, 587–88, 207 Ct.Cl. 333 (1975). In numerous cases, employees faced with equally unpalatable choices have been held to have made their decision voluntarily.[39] Despite the obvious difficulty of his situation, Donaggio had a choice. He could "stand pat and fight," but chose not to do so. *Christie*, 518 F.2d at 587.

█ The relevant cases recognize that an employee's decision is involuntary if precipitated by threats made in bad faith. *Stone*, 855 F.2d at 174, 177; *Christie*, 518 F.2d at 588. In other words, had police officials threatened to take disciplinary action against Donaggio when they knew or believed they had no legal basis for doing so, Donaggio's decision to attend the demonstration would be deemed to have been involuntary. Whether discipline in fact could have been legally imposed is irrelevant. *Christie*, 518 F.2d at 588. Although the police supervisors who threatened Donaggio were clearly mistaken about the propriety of imposing discipline in these circumstances, there is no evidence in the record nor any allegation that they acted in bad faith.

Because Donaggio was not compelled to take part in the demonstration at the Capitol, his constitutional right to refrain from speaking was not infringed. As a result, his § 1983 claims may not succeed against either defendant.

**B.**

█ Even assuming, *arguendo*, that Donaggio had been compelled to "speak" by being required to participate in the detail, defendants in this action still would not be

---

37. The only misconception under which Donaggio arguably labored when he decided to attend the demonstration was that police officers from other jurisdictions would also be appearing at the Capitol. Yet, Donaggio did not principally rely on this misrepresentation in deciding whether to attend the demonstration. By his own statement, the foremost considerations in his mind in deciding to show up for the detail were the threatened disciplinary action and his reputation within the department. *See supra* note 7.

38. A fourth factor mentioned in *Stone*, whether he was permitted to select the effective date of

resignation, is not applicable here. 855 F.2d at 174.

39. *Stone* cites several such cases. 855 F.2d at 174–75; *see Pitt v. United States*, 420 F.2d 1028, 190 Ct.Cl. 506 (1970) (employee voluntarily chose resignation over facing criminal charges); *Cosby v. United States*, 417 F.2d 1345, 189 Ct.Cl. 528 (1969) (employee voluntarily chose resignation over facing charges of gross insubordination); *Autera v. United States*, 389 F.2d 815, 182 Ct.Cl. 495 (1968) (employee voluntarily chose resignation over facing charges of incompetence).

liable to him because they were not the authors of the compulsion.

■ There is no vicarious liability under § 1983. *See Monell v. Department of Social Servs.,* 436 U.S. 658, 691–94, 98 S.Ct. 2018, 2036–38, 56 L.Ed.2d 611 (1978). In other words, a party is not liable under § 1983 unless that party's conduct violated the plaintiff's rights in some manner. The parties who allegedly violated Donaggio's right against compelled speech were mid-level police officials such as Corporal Chapman and Lieutenant Blake. They were the ones who refused to excuse Donaggio from the overtime detail despite his opposition to its political message. Yet, these police officials are not defendants in this case.

Donaggio presents three arguments why one or both of the defendants named in this action are liable to him under § 1983. None is ultimately persuasive.

### 1.

■ Donaggio argues first that the police supervisors' actions were indicative of a "policy or custom" of Arlington County. To establish § 1983 liability against a governmental entity,[40] the plaintiff must show that the constitutional injury resulted from an official "policy or custom" of that entity. *Monell,* 436 U.S. at 691, 98 S.Ct. at 2036; *see also Canton v. Harris,* 489 U.S. 378, 385 (1989). The "policy or custom" may be a formal one, such as a regulation or ordinance, or an informal one that is "so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 167–68, 90 S.Ct. 1598, 1614, 26 L.Ed.2d 142 (1970); *Monell,* 436 U.S. at 691, 98 S.Ct. at 2036.

There is no evidence that Arlington County had a formal or informal policy or custom of requiring its police officers to appear at political demonstrations against their wishes. In fact, the record evidence is flatly to the contrary. Chief Stover believed it was within his authority to send police officers to the Capitol building demonstration if the officers were volunteers. Had he known that Donaggio or other officers had expressed reluc-

tance to participate, he testified that he would have excused them from doing so. In addition, Michael Edwards, the County's designated representative on legislative policy under Rule 30(b)(6), Fed.R.Civ.P., stated in deposition that he did not believe a director of a county department could order employees to participate in an expressive, political display. Although Edwards believed department directors had authority to request volunteers, as Chief Stover apparently did, Edwards did not suggest that County policy, formally or informally, authorized a director to compel unwilling employees to participate. In short, Donaggio has presented no evidence to refute the statements of Stover and Edwards. It therefore appears beyond dispute that Arlington County did not have a policy or custom of forcing its employees to participate against their will in events similar to the assault weapons ban demonstration.

### 2.

■ Donaggio's second argument relies on the "policymaker" line of cases which recognizes that some government officials are positioned such that their "edicts or acts may fairly be said to represent official policy." *Monell,* 436 U.S. at 694, 98 S.Ct. at 2037–38. In other words, an official's actions may subject a government entity to § 1983 liability if the official has "final authority to establish municipal policy." *See Pembaur v. City of Cincinnati,* 475 U.S. 469, 477–483, 106 S.Ct. 1292, 1297–1300, 89 L.Ed.2d 452 (1986) (decision by municipal policymaker on single occasion may satisfy "official policy" requirement of § 1983). Whether an official has sufficient policymaking authority is a question of state law. *City of St. Louis v. Praprotnik,* 485 U.S. 112, 123, 108 S.Ct. 915, 924, 99 L.Ed.2d 107 (1988).

■ Donaggio strenuously argues that Chief Stover had authority to make policy for the County with respect to its police department. Yet, this debatable proposition is beside the point. Chief Stover is not the relevant official, because he was not the one whose conduct might have violated Donaggio's constitutional rights. Stover instructed

---

**40.** The discussion in this section and the next applies equally to Donaggio's § 1983 claims against Arlington County and against Chief Stover in his official capacity. *See supra* note 13.

his subordinates to obtain volunteers for the demonstration. Had Donaggio's First Amendment rights been violated, the injury would be attributable to the police supervisors who improperly refused to relieve him from the overtime detail when he objected to it. Donaggio has not argued that the police lieutenants and corporals with whom he dealt were "policymakers" for § 1983 purposes, and in any event, such an argument would be futile. Decisions in this circuit are divided as to whether a police chief or sheriff is a policymaker for § 1983 purposes,[41] but none suggests that lower police officials have such authority. Police lieutenants and corporals plainly do not wield final authority within the police department, in theory or in practice.[42] Convincing evidence of this is found in the fact that Lieutenant Blake told Donaggio on the morning of the demonstration that he would *request* that disciplinary action be imposed if Donaggio refused to cooperate. In doing so, Blake admitted that he did not have authority to impose a punishment on Donaggio. In sum, it is clear from the undisputed record facts that the police officials who allegedly compelled Donaggio to attend the demonstration at the Capitol were not authorized to make final policy for the County or its police department. Accordingly, the "policymaker" line of cases is of no help to Donaggio.

### 3.

■ Donaggio finally contends that Chief Stover is liable under § 1983 in his individual capacity. But this argument, too, must fail because Stover did not commit or direct a violation of Donaggio's rights. Stover's affidavit states that he intended for the police officers who participated in the event to be fully-informed volunteers. His involvement was limited to approving the overtime detail and authorizing overtime pay for the officers who volunteered to attend. Donaggio has introduced no evidence to suggest that Stover did more than this. Instead, he argues that Stover is liable for what he failed to do, namely his failure to inquire about how his subordinates carried out his instructions to obtain volunteers for the overtime detail, and his failure to take special precautions to insure that no officer was compelled to participate. In other words, Donaggio claims that even if Stover took no affirmative action that violated Donaggio's constitutional rights, he is liable for negligently failing to prevent his subordinates from doing so.

This circuit has long recognized that a supervisory official may be held liable under § 1983 when his own "supervisory indifference" or "tacit authorization" of his subordinates' misconduct causes constitutional injury. *Slakan v. Porter,* 737 F.2d 368, 372 (4th Cir.1984), *cert. denied,* 470 U.S. 1035, 105 S.Ct. 1413, 84 L.Ed.2d 796 (1985). The supervisor is not vicariously liable, but rather is liable for his own infliction of constitutional injury. *Id.* Three elements are required for such supervisory liability, namely:

(1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a "pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff,

(2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices," and

**41.** *Compare Crowley v. Prince George's County,* 890 F.2d 683, 685–87 (4th Cir.1989) (police chief is not § 1983 policymaker with respect to personnel decisions), *with Dotson v. Chester,* 937 F.2d 920 (4th Cir.1991) (county sheriff is § 1983 policymaker with respect to county jail); *Revene v. Charles County Comm'rs,* 882 F.2d 870, 874 (4th Cir.1989) (county sheriff is § 1983 policymaker with respect to county law enforcement); *Spell v. McDaniel,* 824 F.2d 1380, 1387–88 (4th Cir.1987) (police chief is § 1983 policymaker with respect to police training); *Fenner v. Dawes,* 748 F.Supp. 404, 408 (E.D.Va.1990) (police chief is § 1983 policymaker).

**42.** An official's actions clearly do not establish official policy if subject to close review by higher authorities. *See Hughes v. Halifax County Sch. Bd.,* 855 F.2d 183, 185 (4th Cir.1988) (school maintenance supervisor is not § 1983 policymaker because of superior authority of school board); *Morrash v. Strobel,* 842 F.2d 64, 67–68 (4th Cir. 1987) (city's public safety director is not § 1983 policymaker because of superior authority of city manager and city council).

(3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud,* 13 F.3d 791, 799 (4th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 67, 130 L.Ed.2d 24 (1994). There is scant evidence here for any of the required elements, including deliberate indifference, tacit authorization, and causation. In any event, it is unnecessary to decide whether there is a genuine issue of fact as to those elements, because there was plainly no "pervasive and unreasonable risk" of constitutional injury involved here. Establishing such a risk requires evidence that the improper conduct was "widespread, or at least has been used on several different occasions." *Id.* The factual record falls far short of creating a genuine factual issue as to this requirement. There is no record evidence of a prior instance of compelled speech involving Arlington County police officers or other County employees. Because there is no genuine issue of material fact as to Chief Stover's liability, he is entitled to summary judgment on the § 1983 claims brought against him.

### C.

 Donaggio's § 1983 claims against Chief Stover also fail on the ground of qualified immunity. Government officials are immune from civil damages liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). To fall outside the immunity, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). Chief Stover agreed to send a group of police officers to the event at the Capitol, and authorized payment of overtime wages to them. He intended the detail to be staffed with officers who volunteered and were willing participants, although he did nothing to ensure that the detail was carried out as he expected. In these circumstances, even if this conduct violated someone's constitutional rights, a reasonably competent police chief could not be faulted for being unaware of the violation. As a result, qualified immunity bars recovery under § 1983 against Chief Stover.

### IV.

Defendants are entitled to summary judgment on each of Donaggio's federal claims. Donaggio also raises a number of state-law claims in Counts 3 and 4 of his complaint. Having dismissed all federal claims, the Court declines to exercise supplemental jurisdiction over these state-law claims. 28 U.S.C. § 1367(c)(3). The state claims are therefore dismissed without prejudice to Donaggio pursuing them in a state court.

An appropriate order shall issue.